STADTMUELLER, District Judge.
On the night of March 21, 2012, City of Fitchburg police officers responded to an anonymous 911 call reporting a group of twenty-five individuals acting loudly and displaying hand guns in a parking lot. Upon arriving at the scene, the officers observed something different: a smaller group of individuals, none of whom appeared to be acting inappropriately. The officers approached this group, which had begun to disperse slowly. For no apparent reason, one of the officers singled out the appellant, Andre Williams, and performed a frisk. Mr. Williams began to resist the frisk and tried to escape, but was ultimately restrained. Thereafter, the officers searched his body and found both a handgun and several ‘ecstasy’ pills. Mr. Williams was arrested and charged with being a felon in possession of a firearm. He moved to suppress the evidence seized from him, but the district judge ultimately denied his motion. Thereafter, Mr. Williams pled guilty to possession of a firearm as a convicted felon, but reserved his right to appeal. At sentencing, the district judge applied two sentencing enhancements, which significantly increased William’s offense level and applicable range of imprisonment under the advisory sentencing guidelines. Following sentencing, Mr. Williams appealed his conviction and sentence to this court, arguing that the evidence used to obtain the conviction should have been suppressed, and, in the alternative, that the district judge erred in applying the sentencing enhancements. We find that the search was unlawful, and accordingly reverse the denial of his suppression motion, vacate his judgment of conviction, and remand the matter for additional proceedings consistent with this *681 opinion. Because we reverse the underlying judgment of conviction, we need not reach the sentencing enhancement issue.
I. Background
On the night of March 21, 2012, at 11:25 p.m., a woman called 911 to report the presence of a large group of individuals in a parking lot outside of a bar in Fitchburg, Wisconsin. The woman refused to provide her name, but explained that there were approximately twenty-five people, three or four of whom she had observed with “guns out.” She did not report any fighting or threatening behavior, instead only informing the 911 dispatcher that the people were being loud while loitering in the parking lot of Schneid’s, a local bar (to which the police apparently respond quite often due to reports of violence, gang activity, drugs, and weapons).
As a result of receiving this tip, the dispatcher sounded a tone at the City of Fitchburg Police Department’s (“the Department”) headquarters indicating a weapons call. That tone issued during the Department’s nightly briefing, and a number of officers immediately suited up to respond to the call.
The officers drove to Schneid’s parking lot, arriving three to five minutes after the call, and observed a much different scene than that reported by the anonymous caller. Instead of seeing a group of twenty-five belligerent men, the officers discovered only eight to ten individuals standing around a group of cars in the parking lot. At the time the officers approached the group, the individuals were not loud or otherwise acting disruptively, nor were they displaying their firearms. In fact, one of the officers, Ryan Jesberger, testified that he and the other officers from his department were not even sure that this smaller group was the same one that had been reported by the anonymous caller.
The officers approached the group anyway. As they approached, the group apparently began to disperse, but no one attempted to flee the scene. Each member of the group appeared to act in the same manner, avoiding eye contact with the officers and walking slowly away from the area.
For reasons that are entirely unclear from the record, the officers began to perform pat-downs on the members of the group. Officer Jesberger singled out Mr. Williams, in particular, and requested that Mr. Williams step forward and display his hands. At the evidentiary hearing on this issue, Officer Jesberger stated that he started to “zero in” on Mr. Williams “once [Officer Jesberger] saw the way [Mr. Williams] was acting.” However, Officer Jesberger did not provide any further detail on what, precisely, piqued his interest in Mr. Williams, as opposed to the other members of the group. While, apparently, Mr. Williams was not making eye contact with the officers and was attempting to slowly move away from the scene, all of the evidence indicates that every other member of the group was doing exactly the same thing.
After Officer Jesberger requested that Mr. Williams step forward, Mr. Williams asked ‘Why?,” but was compliant in every other respect. At Officer Jesberger’s request, Mr. Williams stepped out from his position between two cars, showed his hands, and then placed his hands on his head.
Officer Jesberger then began to pat down Mr. Williams. At that point, Mr. Williams began to move his hands toward his waist. Officer Jesberger warned Mr. Williams not to do so, but Mr. Williams continued to move his hands. Accordingly, Officer Jesberger attempted to handcuff Mr. Williams, who instead pulled away and *682 tried to run from the scene. He did not get very far before other officers took him down to the ground. The officers held Mr. Williams to the ground and directed that he pull his hands out from underneath him, but Mr. Williams did not (or perhaps could not) comply. They then attempted to get him to comply by striking him with their knee and tasering him. This worked, and Officer Jesberger was finally able to handcuff Mr. Williams. However, during this scuffle, another officer injured his knee when he moved it in an unnatural way.
With Mr. Williams successfully detained, the officers performed a pat-down search of his person and recovered a handgun, several ecstasy pills, and approximately $600.00 in cash. They immediately placed Mr. Williams under arrest.
On April 18, 2012, Mr. Williams was indicted in the Western District of Wisconsin, and charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).
He then moved to suppress the gun recovered from him during Officer Jesber-ger’s frisk. Mr. Williams argued that suppression was appropriate, because the officers did not have a reasonable suspicion on which to base either their initial investigatory stop or to perform the frisk of Mr. Williams. Magistrate Judge Stephen Crocker held an evidentiary hearing on the motion approximately one week later, after which time he recommended that Mr. Williams’ motion be denied. The magistrate judge suggested that the frisk was unconstitutional but was sufficiently deliberate to require exclusion of the gun, by proposing an extension of the logic of Herring v. United States, 555 U.S. 185, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009), to a warrantless frisk in a Terry stop.
Both Mr. Williams and the government objected to that ruling. Mr. Williams objected to the final determination that the gun should not be suppressed; the government objected to the magistrate’s finding that the frisk was unconstitutional.
While the objections were pending before District Judge William Conley, Mr. Williams entered into a plea agreement with the government. He agreed to plead guilty, but reserved his right to appeal if the district judge determined that the gun should not be suppressed.
The district judge eventually determined that the gun should not be suppressed, and Mr. Williams pled guilty. The matter progressed toward sentencing. The probation officer prepared a presentence report, determining Mr. William’ guideline range of imprisonment to be thirty-seven to forty-six months. The sentencing judge applied two sentencing enhancements, and ultimately imposed a 70-month sentence.
Mr. Williams appealed, arguing that the district judge erred in failing to exclude the firearm and in applying both of the sentencing enhancements. Because we agree that the failure to exclude the firearm was in error, we need not reach the sentencing issues.
II. Discussion
If we determine that the district judge should have suppressed the firearm, then we must vacate Mr. Williams’ judgment of conviction. In such a case, we need not review the sentencing enhancement issue.
There are two grounds upon which we can find that the gun should have been suppressed. First, if we determine that the initial stop of Williams, when Officer Jesberger asked him to step out from the group and submit to a frisk, was unconstitutional, then we must also determine that all of the later occurrences, including the frisk and recovery of the firearm, were similarly unconstitutional, and likely war *683 rant suppression. Second, even if we were to determine that the initial stop was permissible, then we must ask whether the frisk itself was constitutional. If we find that it was not, then the later recovery of the firearm was also unconstitutional, likely warranting suppression of the firearm.
For the reasons that follow, we find that the frisk was unconstitutional, and therefore hold that the district judge erred in denying Mr. Williams’ motion to suppress. Accordingly, we do not reach the sentencing enhancement issue.
A. Standard of Review
We review the district judge’s denial of Mr. Williams’ suppression motion, reviewing factual findings for clear error and both legal conclusions and mixed questions of law and fact de novo. United States v. Freeman, 691 F.3d 893, 899 (7th Cir.2012) (citing United States v. Huebner, 356 F.3d 807, 812-13 (7th Cir.2004)); United States v. Burnside, 588 F.3d 511, 516-17 (7th Cir.2009) (citing United States v. Mosby, 541 F.3d 764, 767 (7th Cir.2008); United States v. Groves, 530 F.3d 506, 509 (7th Cir.2008); United States v. McIntire, 516 F.3d 576, 578-79 (7th Cir.2008); United States v. Fiasche, 520 F.3d 694, 697 (7th Cir.2008)).
In this case, we are called upon to examine the district court’s legal determination that Officer Jesberger’s stop and frisk of Mr. Williams was constitutional. The parties do not disagree over the factual record, as set forth by the district judge. Rather, their dispute is solely over the application of the relevant law to those facts. Accordingly, our review of the district judge’s determination on the stop and frisk must be de novo — particularly because “ ‘what happened’ is not an issue,” in this case. United States v. Carlisle, 614 F.3d 750, 754 (7th Cir.2010) (citing Burnside, 588 F.3d at 516).
B. Discussion
As we have already mentioned, there are two junctures at which we could find the search leading to the recovery of the firearm to be unconstitutional: at the moment that Mr. Williams was singled out and stopped, or at the moment that Mr. Williams was frisked. Slightly different legal standards apply to each of those situations, so we address them separately. See, e.g., Ybarra v. Illinois, 444 U.S. 85, 94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (pointing out that, even if an initial stop is lawful, a subsequent frisk must be separately supported to be constitutional); United States v. McKoy, 428 F.3d 38, 39 (7th Cir.2005) (“It is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met.”).
1. Initial Stop
In this portion of my opinion, I disagree with Judge Hamilton, and find that the police officers’ initial stop of the group of individuals was lawful.
Police officers may detain a suspect for a brief investigatory stop if they have a “reasonable suspicion based on articulable facts that a crime is about to be or has been committed.” Carlisle, 614 F.3d at 754-55 (citing United States v. Wimbush, 337 F.3d 947, 949 (7th Cir.2003)); Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This requires “more than a hunch but less than probable cause.” Jewett v. Anders, 521 F.3d 818, 823 (7th Cir.2008) (citing Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); United States v. Lenoir, 318 F.3d 725, 729 (7th Cir.2003)). To find that reasonable suspicion existed to justify as stop, the Court must examine the totality of the circumstances in the *684 situation at hand, in light of the individual officers’ own training and experience, and should uphold the stop if it finds that “the detaining officer ha[d] a ‘particularized and objective basis’ for suspecting legal wrongdoing.” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).
The first question I must ask is what, precisely, Officer Jesberger relied upon in deciding to stop Mr. Williams. The Government points, almost exclusively, to the anonymous 911 call, itself, arguing that the call was an emergency report, which can support an officer’s reasonable suspicion with less objective evidence to corroborate the report. See United States v. Hicks, 531 F.3d 555, 559-60 (7th Cir.2008) (citing Alabama v. White, 496 U.S. 325, 332, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)). However, in passing, the government also mentions that this stop occurred at night in a high-crime area.
Do those facts, taken in conjunction with one another, support a finding that Officer Jesberger had a reasonable suspicion to stop Mr. Williams? Yes, but this is a very close call.
The 911 call, in and of itself (and despite being anonymous), provided Officer Jes-berger with a reasonable suspicion to stop Mr. Williams. When responding to an emergency report, officers may use the report, itself, to justify a Terry stop, provided that the report describes an ongoing emergency, as opposed to general criminality. See Hicks, 531 F.3d at 558-59 (distinguishing Florida v. J.L., 529 U.S. 266, 268, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) on the basis that the report in Hicks provided details of an ongoing emergency situation, whereas the tip in J.L. reported only general criminality). In Hicks, we found that an individual’s 911 call reporting that “There’s a guy beating a woman up in my house,” was an emergency report justifying a Terry stop. Hicks, 531 F.3d at 557, 560. Here, the 911 call was arguably even more specific in reporting an emergency situation. The caller stated that there was a large group of people being loud and waving guns (R. 41, at 3-4) in a location at which violent crime and drug activity is regularly reported.[1] An officer responding to that scene would certainly be justified in believing that a volatile emergency situation was underway, and stopping members of a nearby group of individuals upon arrival at the scene. Therefore, I find that the 911 call supported a reasonable suspicion that a crime was in progress or about to be committed, making the stop a permissible Teiry stop. See, e.g., id.; Terry, 392 U.S. at 30, 88 S.Ct. 1868.
Moreover, that conclusion is not changed by the fact that the 911 call was made anonymously. Mr. Williams argues that the 911 call could not support a reasonable suspicion, under J.L., because it was made *685 anonymously. That is incorrect. The mere fact that the caller was anonymous is not enough, under J.L. to make the 911 call per se unreliable. Hicks, 531 F.3d at 558-59 (citing United States v. Brown, 496 F.3d 1070, 1077 (10th Cir.2007); United States v. Elston, 479 F.3d 314, 319 (4th Cir.2007); United States v. Drake, 456 F.3d 771, 775 (7th Cir.2006); United States v. Terry-Crespo, 356 F.3d 1170, 1176 (9th Cir.2004); Anthony v. City of New York, 339 F.3d 129, 136-37 (2d Cir.2003); United States v. Holloway, 290 F.3d 1331, 1338-39 (11th Cir.2002); United States v. Valentine, 232 F.3d 350, 354 (3d Cir.2000)); see also United States v. Wooden, 551 F.3d 647 (“Doubtless greater confidence can be achieved when police know a caller’s identity ... yet, as a practical matter a name given by a caller does not make a tip any less anonymous ... it would undermine the goal of the 911 system to require a caller to prove his identity.”). So long as the call reported an ongoing emergency, J.L. may be distinguished. Hicks, 531 F.3d at 558-59 (“Every circuit to consider the question has distinguished J.L. when the tip is not one of general criminality, but of an ongoing emergency ... or very recent criminal activity.”) Here, where the caller also provided information regarding how she obtained the information on which she based her report, I find it appropriate to hold that Officer Jesberger had a reasonable suspicion for the stop. Wooden, 551 F.3d at 649 (“The caller in this case told us how he knew that Wooden had a gun ... [c]orroboration of other information would not make this claim more plausible.”).
Mr. Williams also asserts that the changed circumstances between the time of the 911 report and the officers’ arrival on the scene undermined the credibility and emergency nature of that report, thus depriving it of its ability to provide Officer Jesberger with a reasonable suspicion to conduct the Terry stop; again, he is incorrect, though this is a much closer question. As Mr. Williams points out, the 911 caller reported that there was a group of 25 or more individuals in the parking lot being very loud. When the officers arrived, only eight to ten individuals remained, and apparently none of them were acting in a loud or threatening manner. But I find that those facts are not enough to strip the 911 report of either its credibility or of its emergency nature.
This does not undermine the report’s credibility. As to that issue, I look again to Hicks, which noted that “a lower level of corroboration is required before conducting a stop on the basis of an emergency report.” 531 F.3d at 559 (citing Quarles, 467 U.S. 649, 104 S.Ct. 2626). Thus, here, where the caller remained anonymous, but provided very specific details about the location and activities of a group of men, I believe that low level of corroboration is satisfied. Additionally, while the group was smaller, by approximately one-half to two-thirds, upon the arrival of police, that fact should not undermine the credibility of the call. The officers arrived within three to five minutes, which is more than enough time for some participants to have left (especially if they were frightened by an escalating violent situation) but not likely enough time for an entire group of 25 people to have left and been replaced by a new group of eight to ten. Accordingly, I find that the low threshold of corroboration required to rely on an emergency call was satisfied.
Relatedly, the fact that the officers found a much smaller group of men who were not acting loudly or brandishing weapons, did not suddenly strip the report of its emergency nature. Wooden, 551 F.3d 647, is instructive. In that case, an anonymous caller provided a description of an individual, who he said had drawn a *686 weapon from his holster during a fight with his girlfriend. Id. Police responded and found a couple near the reported scene, who were no longer arguing. Id. Despite that change in circumstances, we nonetheless upheld a stop of the armed individual. Id., at 649-50. The same should be the case here. Any change in the number of people present and their activity could very well have been attributable to the arrival of the police and the time between the call and the officers’ arrival. That change from volatile to stable, which happened very quickly, was not guaranteed to be permanent. Indeed, in a previously-volatile situation in which guns have recently been reported, officers can (and likely should) proceed with a reasonable suspicion that violence may break out again in a short time. Moreover, the situation had not changed so drastically that the officers should have assumed that the emergency potential had entirely passed without possibility of return. Eight to ten individuals still remained in a parking lot known for the occurrence of previous violent and criminal activity. This fact supported a belief that the threat of the reported emergency continued, even after officers arrived at the scene and discovered a different situation than was initially reported.
For these reasons I find that Officer Jesberger’s stop of Mr. Williams was supported by a reasonable suspicion. Accordingly, the district court properly found that the stop was permissible.
2. Subsequent Frisk
Both Judge Hamilton and I agree, on the other hand, that the district court’s decision on the frisk issue was in error.
A reviewing court must analyze a frisk separately from an initial stop, applying a slightly different standard to determine whether the frisk was lawful. See, e.g., Ybarra, 444 U.S. at 94, 100 S.Ct. 338; McKoy, 428 F.3d at 39. This separate standard is necessary to protect the public from frisks, which are “a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment.” Teny, 392 U.S. at 17, 88 S.Ct. 1868. Thus, given the more burdensome intrusion of a frisk, such action should only be allowed when the officer can point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger. Id. at 27, 88 S.Ct. 1868. In other words, an officer performing a Terry stop may not automatically frisk the individual subject to the stop; rather, to do so, the officer must have some articulable suspicion that the subject is “armed and dangerous.” Arizona v. Johnson, 555 U.S. 323, 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009); United States v. Pedroza, 269 F.3d 821, 827 (2001) (citing Terry, 392 U.S. at 27, 88 S.Ct. 1868). This more specific analysis, requiring the officer to hold a reasonable suspicion that the subject is “armed and dangerous” as opposed to being generally suspicious, allows courts to distinguish between legitimate and illegitimate frisks, the latter of which constitute severe intrusions upon individual liberty. Terry, 392 U.S. at 27, 88 S.Ct. 1868.
Again, we begin our analysis by examining the circumstances that Officer Jesber-ger may have relied upon in deciding to frisk Mr. Williams. The government asserts that the following facts supported Officer Jesberger’s decision to frisk Mr. Williams: the fact that the group, in general, avoided eye contact with the officers and started to move away from the area upon the officers’ arrival; the fact that Mr. Williams, in particular, had his hands in his pocket or near his waistband, avoided eye contact, and began to move away from *687 the area; the fact that this all occurred in a high crime area; and the fact that the police were responding to a 911 call reporting weapons.
None of those facts, alone or together, could have supported a reasonable suspicion that Mr. Williams was armed and dangerous. To begin, the Court cannot see how the group’s general behavior could possibly support a reasonable suspicion that Mr. Williams, himself, was armed and dangerous. Moreover, neither the group behavior nor Mr. Williams’ own personal behavior could support a reasonable suspicion that he was armed and dangerous. Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area, thus making such behaviors of very little import to a reasonable suspicion determination. See, e.g., United States v. Broomfield, 417 F.3d 654, 655 (7th Cir.2005) (noting that importance of eye contact is purely subjective and easily skewed by police officers to support their view of a situation); United States v. Simpson, 609 F.3d 1140, 1147 (10th Cir.2010); United States v. Urrieta, 520 F.3d 569, 577 (6th Cir.2008); McKoy, 428 F.3d at 40; United States v. Portillo-Aguirre, 311 F.3d 647, 656 n. 49 (5th Cir.2002); United States v. Jones, 269 F.3d 919, 928 (8th Cir.2001); and United States v. Richardson, 385 F.3d 625, 630-31 (6th Cir.2004).
Additionally, while we understand that the fact that a stop occurs in a high-crime area may be a factor under Terry, we believe that the rest of the case for a frisk, here, was so weak that this factor cannot save the frisk. “Even in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted.” Maryland v. Buie, 494 U.S. 325, 342 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (applying Terry’s principles to protective sweep of a house). In fact, even when police have a warrant to search the premises of an area, they must have separate, particularized cause to search the people who are coincidentally therein. Ybarra v. Illinois, 444 U.S. at 91, 100 S.Ct. 338. Just as “[e]ach patron who walked into the” searched premises in Ybarra was “clothed with constitutional protection against an unreasonable search an seizure,” so was Mr. Williams when he stood in the parking lot on the night in question. Id. Thus, here, where the officers knew of the high crime nature of the area, but had no other basis for reasonable, individualized suspicion of Mr. Williams, the frisk was still inappropriate.
Finally, while officers were responding to a weapons call, that fact could not give rise to a reasonable belief that Mr. Williams, personally, was armed and dangerous. By the time the officers arrived, the situation looked much different than had been reported during the 911 call. Considerably fewer people were present, and the individuals who were present were not acting loudly or displaying their weapons. Thus, upon their arrival, the officers had practically no reason to believe that any of the remaining individuals were armed and dangerous. Indeed, the individuals with guns may have been among the 15 to 20 individuals who had left the group between the time of the call and the officers’ arrival. Moreover, the 911 caller did not provide any information that would have identified Mr. Williams as one of the individuals in possession of a weapon. In sum, the 911 call was vague, circumstances had changed, and therefore we cannot envision that the call support a reasonable belief Mr. Williams was armed and dangerous.
*688 Even taking every one of those facts in conjunction with one another, we must conclude that, together, they do not support a reasonable belief that Mr. Williams was armed and dangerous. The government is required to show that Officer Jes-berger’s frisk was supported by articulable facts that could establish specifically that Mr. Williams was armed and dangerous. The facts, here, are much more general, and could be applied to practically any person that had been around the area when the officers showed up that night. Indeed, similar facts could support a search of practically anyone who happens to be near a high-crime area at night when police are called. That is the very evil that the Terry court was concerned with unleashing, and the reason that the Terry court restrained the ability to frisk. See Terry, 392 U.S. at 17-18, 88 S.Ct. 1868. Accordingly, we are obliged to conclude that Officer Jesberger’s frisk of Mr. Williams was unconstitutional.[2]
The Government argues that our recent decision in United States v. Patton, 705 F.3d 734 (7th Cir.2013), compels an opposite conclusion, but we disagree. Patton is distinguishable. In that case, officers responded to a report of seven to eight men drinking alcohol on a public sidewalk. Id., at 735. The report came at 1:30 a.m. from a high-crime neighborhood, where there had been recent shootings. Id. When they arrived on the scene, the officers saw several men with open beer cans, but Mr. Patton, himself, did not have a beer can. Id. The officers instructed all of the men, including Mr. Patton, to step toward a nearby Cadillac. Id. Patton began to back away from the group, stepping backwards by approximately five and fifteen feet onto the lawn behind the sidewalk he had previously been standing on. Id., at 736. At an evidentiary hearing, the arresting officer stated that when a suspect backs away in that manner, it typically means that the individual has a gun or is subject to an outstanding warrant. Id. The officer was eventually able to bring Mr. Patton toward the Cadillac, where he frisked Mr. Patton and discovered a firearm. Id. The district court held that the frisk was permissible and we affirmed. But, there are a number of distinguishing factors in that case. To begin, in Patton, the defendant was part of a group that was openly violating the law, even if he, himself, did not have a beer in his hand. Here, on the other hand, neither Mr. Williams nor the group as a whole was acting illegally in any way — ■ indeed, they were not even loud or belligerent when the police arrived. Additionally, Mr. Patton exhibited behavior that was much more apparent and concerning than Mr. Williams’ behavior, here. Mr. Patton backed up by at least five feet after being told to step forward, leaving the sidewalk and moving onto the lawn behind it; here, on the other hand, Officer Jesberger reported only that Mr. Williams (as well as the rest of the group) seemed to move away and act nervously. Officer Jesber-ger did not identify any specific movement or act by Mr. Williams that caused him concern, but rather pointed to a general sense of nervousness and backward movement, all of which occurred before Mr. Williams was asked to step forward. In *689 fact, Mr. Williams was generally compliant with all of the officers’ commands until the frisk began, and did nothing whatsoever that would have singled himself out from the other members of the group. Therefore, we believe that Patton is distinguishable and does not apply in this case.
It is important to note, here, that all three members of this panel reject the Government’s view that the officers were entitled to frisk every person present on the scene. It is certainly clear that they lacked the requisite individualized suspicion to do so. Nonetheless, at the eviden-tiary hearing it became clear that, when the officers arrived on the scene, they each stopped a separate member or members of the group. See R. 30, at 19-22 (“Other officers were arriving on scene and contacting various subjects within that group and attempting to obviously deem the scene safe.”). Thus, Officer Jesberger likely would have stopped and frisked Mr. Williams regardless of the placement of his hands. The fact of where he had placed his hands was simply a convenient reason for doing so, afterwards.
Nonetheless, that single fact, even taken in conjunction with all of the other facts surrounding the frisk, still does not support a reasonable suspicion. To begin, Mr. Williams immediately removed his hands from his pockets at Officer Jesberger’s request. It was only after Mr. Williams had removed his hands that Officer Jes-berger decided to frisk him. Furthermore, the simple fact that one’s hands are in one’s pockets is of a similar nature to one’s avoiding eye contact. In other words, it is of little value. If one were to drive down any given street, it is likely that an uncountable number of citizens would have their hands in their pockets. This does not change in high crime neighborhoods. Certain people prefer their hands to be pocketed — and why not? It can often be more comfortable. But, under the dissent’s view, if Mr. Williams had simply decided not to avail himself of that comfort, he would not have been subject to a frisk. On this, we should note that we do not believe that pocketed hands are entirely irrelevant nor do we create a categorical rule finding them so. Indeed, if one’s hands are pocketed in an awkward way or if it seems that the individual is holding a larger-than-average item in his or her pocket, those facts could lead a reasonable officer to believe that a gun was contained therein, and support a frisk. But, the simple act of holding one’s hands in should not be grounds for a search, even if it occurs at night in a high-crime area. We cannot support a rule that seemingly would allow those people who typically spend time in “low crime” areas (read: more affluent areas of town) to walk around with hands pocketed at night while not being subject to search, while depriving people in higher crime areas of that same ability.
3. Herring v. United States
The final question we must ask is whether Officer Jesberger’s frisk of Mr. Williams was so deliberate that the exclusionary rule should apply. Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009); see also Hudson v. Michigan, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (exclusion is a “last resort, not our first impulse”); United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); Illinois v. Gates, 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In Herring, the Supreme Court noted that courts should not exclude evidence unless the actions in question were “sufficiently deliberate that exclusion can meaningfully deter” similar actions in the future, and that the actions were “sufficiently culpable that such deterrence is worth the price paid by the judi *690 cial system.” Herring, 555 U.S. at 144, 129 S.Ct. 695. The magistrate judge, below, relied upon this rule in recommending that the firearm should not have been suppressed, and therefore we think it appropriate to address the issue.
Officer Jesberger’s action, here, was both deliberate and culpable to an extent that warrants suppression under Herring. As we stated above, Officer Jesberger had little articulable reason to suspect that Mr. Williams was armed and dangerous. In fact, the reasons he did articulate could have been used as pretext to search practically any person who was near the scene on the night of the arrest. For no apparent reason, Officer Jesberger singled out Mr. Williams, and proceeded to search him. It is entirely unclear from the record what, precisely, about Mr. Williams set off Officer Jesberger’s sense that he should be searched. But, in reaching our conclusion in this case, we hope that other officers will be deterred from engaging in the arbitrary, almost random, search of individuals who happen to be near the scene of a crime. Therefore, suppression in this case is appropriate under Herring.
III. Conclusion
Last, we feel it appropriate to address several additional points raised in the dissent. First, Judge Ripple overstates the fact that Mr. Williams “approached” Officer Jesberger with his hands in his pockets. Dissenting Op. at 696. While that may, technically, be true, it should be clarified that Mr. Williams approached Officer Jesberger at the officer’s request and immediately removed his hands from his pockets at the officer’s request. This sort of compliant behavior is not the makings of reasonable suspicion that a person is armed and dangerous. Moreover, this is a much different picture than that painted by Judge Ripple: Mr. Williams never walked toward Officer Jesberger with his hands pocketed. In fact, Mr. Williams “tried to kind of walk away from the area.” R. 11. Second, Judge Ripple asks for a more concrete rule, wondering what more a subject must “do before an officer can conduct a protective frisk?” Dissenting Op. at 698. But we do not believe any new concrete rule is necessary. Indeed, the rule remains the same: the police officer must have reasonable suspicion that the subject is armed and dangerous. That reasonable suspicion was simply not present, here.
For all of these reasons, we hold that Officer Jesberger lacked a reasonable suspicion to conduct a frisk of Mr. Williams at the time the frisk began, in violation of Mr. Williams’ Fourth Amendment rights. Accordingly, we must Reveese the denial of Mr. Williams’ motion to suppress, Vacate his judgment of conviction, and Remand this matter with instructions to the district judge to grant his suppression motion and for additional proceedings consistent with this decision. As already stated, because we determine that Mr. Williams’ conviction must be vacated, we do not reach the sentencing issues raised by the parties.

. Indeed, this situation is much more egregious than that presented in J.L. In that case, the Supreme Court examined a tip reporting the mere possession of a firearm. J.L., 529 U.S. at 273-74, 120 S.Ct. 1375. Here, on the other hand, the caller reported far more: that guns were being openly displayed in a bar parking lot, to which police frequently reported in response to crime and gang activity, by a large group of people who were acting very loud. Whereas the J.L. caller reported a situation in which an individual was merely possessing a gun in public, the caller in this case reported the much more dangerous situation of multiple individuals displaying guns in a situation that may have been construed as a fight.

. Certainly, it must be noted that Mr. Williams resisted officers' attempts to frisk him. But we must disregard that fact, because that noncompliance occurred only after the frisk began. For purposes of our analysis, we must look to what Officer Jesberger knew at the moment he began to frisk Mr. Williams. The frisk is permissible only if, at that point, Officer Jesberger had some reasonable suspicion that Mr. Williams was armed and dangerous. See, e.g., United States v. Odum, 72 F.3d 1279, 1284 (7th Cir.1995); Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); Terry, 392 U.S. at 27, 88 S.Ct. 1868. He did not, and therefore his frisk of Mr. Williams was unconstitutional.