PAMELA HARRIS, Circuit Judge,
with whom GREGORY, Chief Judge, DIANA GRIBBON MOTZ, Circuit Judge, and DAVIS, Senior Circuit Judge, join, dissenting:
In many jurisdictions and for many years, police officers could assume that anyone carrying a concealed firearm was up to no good. Because public possession of guns was prohibited or tightly regulated, concealed firearms were hallmarks of criminal activity, deadly weapons carried by law-breakers to facilitate their crimes. So it followed, without much need for elaboration, that if a suspect legally stopped by the police was carrying a gun, then he was not only “armed” but also “dangerous,” justifying a protective frisk under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
But that is no longer the case, at least in states like West Virginia. Today in West Virginia, citizens are legally entitled to arm themselves in public, and there is no reason to think that a person carrying or concealing a weapon during a traffic stop—conduct fully sanctioned by state law—is anything but a law-abiding citizen who poses no threat to the authorities. And as behavior once the province of lawbreakers becomes commonplace and a matter of legal right, we no longer may take for granted the same correlation between “armed” and “dangerous.”
The majority disagrees, adopting a bright-line rule that any citizen availing him or herself of the legal right to carry arms in public is per se “dangerous” under the Terry formulation and therefore subject to frisk and disarmament, at police discretion, if stopped for a traffic violation or some other minor infraction. It may be, as the concurring opinion suggests, that this is where we will end up—that the price for exercising the right to bear arms will be the forfeiture of certain Fourth Amendment protections. Cone. Op. at 705-06. But unless and until the Supreme Court takes us there, I cannot endorse a rule that puts us on a collision course with rights to gun possession rooted in the Second Amendment and conferred by state legislatures. Nor would I adopt a rule that leaves to unbridled police discretion the decision as to which legally armed citizens will be targeted for frisks, opening the door to the very abuses the Fourth Amendment is designed to prevent. I must respectfully dissent.
I.
“[A]s public possession and display of firearms become lawful under more circumstances, Fourth Amendment jurisprudence and police practices must adapt.” United States v. Williams, 731 F.3d 678, *708 691 (7th Cir. 2013) (Hamilton, J., concurring). Within the last decade, federal constitutional law has recognized new Second Amendment protections for individual possession of firearms, see McDonald v. City of Chicago, 561 U.S. 742, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010); District of Columbia v. Heller, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and state law has followed, providing expanded rights to carry guns in public, see Williams, 731 F.3d at 691. That states have elected to trust their citizens to carry guns safely cannot, of course, change federal Fourth Amendment law. But it does change the facts on the ground to which Fourth Amendment standards apply. And once it no longer is the case that the public carry of guns is illegal or even unusual, courts must take into account that changed circumstance in applying the familiar Terry standard.
We have recognized as much already when it comes to the “stop” portion of a Terry “stop and frisk,” justified on reasonable suspicion of criminal activity. See Terry, 392 U.S. at 30, 88 S.Ct. 1868; Arizona v. Johnson, 555 U.S. 323, 326-27,129 S.Ct. 781, 172 L.Ed.2d 694 (2009). In jurisdictions in which the public carry of firearms is prohibited or closely regulated, a concealed gun is indicative of criminal activity and may give rise to “reasonable suspicion” sufficient to justify an investigative stop. But when a state elects to legalize the public carry of firearms, we have held, the Fourth Amendment equation changes, and public possession of a gun is no longer “suspicious” in a way that would authorize a Terry stop. United States v. Black, 707 F.3d 531, 539-40 (4th Cir. 2013). “Permitting such a justification” for a Terry stop, we explained, “would eviscerate Fourth Amendment protections for lawfully armed individuals in those states.” Id. at 540.
We are not alone in this insight. In Northrup v. City of Toledo Police Dep’t, 785 F.3d 1128, 1131-33 (6th Cir. 2015), for instance, the Sixth Circuit held that where state law permits the open carry of firearms, the police are not authorized by Terry to conduct a stop—or an attendant frisk—of a person brandishing a gun in public. Where the state legislature “has decided its citizens may be entrusted with firearms on public streets,” the court reasoned, the police have “no authority to disregard this decision” by subjecting law-abiding citizens to Terry stops and frisks. Id. at 1133; see also, e.g., United States v. Leo, 792 F.3d 742, 749-50, 751-52 (7th Cir. 2015) (rejecting “frisk” and search of backpack on suspicion that it contains gun in light of “important developments in Second Amendment law together with Wisconsin’s [concealed-carry] gun laws”); United States v. Ubiles, 224 F.3d 213, 218 (3d Cir. 2000) (invalidating Terry stop based on suspicion of gun possession in open-carry jurisdiction).
In my view, the same reasoning compels the conclusion that in a state like West Virginia, which broadly allows public possession of firearms, reasonable suspicion that a person is armed does not by itself give rise to reasonable suspicion that the person also is dangerous, so as to justify a Terry frisk. Guns, of course, are in some sense intrinsically dangerous. But the question under Terry is whether a person carrying a gun is a danger to the police or others. Tetry, 392 U.S. at 24, 88 S.Ct. 1868. And where the state legislature has decided that its citizens may be entrusted to safely cany firearms on public streets and during traffic stops, and law-abiding citizens have availed themselves of these rights, I do not see how we can presume that every one of those citizens necessarily poses a danger to the police. See Northrup, 785 F.3d at 1133 (absent reasonable suspicion that an armed man is dangerous, *709 officers must “trust ... their State’s approach to gun licensure and gun possession”).
To be clear: As Officer Tharp testified at the suppression hearing, none of the conduct reported in the anonymous tip she received—that an African-American man had loaded a gun in the parking lot of a 7-Eleven and then concealed it in his pocket before leaving in a car—was illegal under West Virginia law. Nor was there any testimony from the officers that the reported conduct was unusual, or “out of place” where it occurred. Cf. United States v. Arvizu, 534 U.S. 266, 276, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (conduct that appears innocuous in one setting but is unusual in another may give rise to reasonable suspicion).[1] In terms of Robinson’s behavior, the officers knew nothing except that Robinson was engaging in what we must treat as a presumptively lawful exercise of his right to carry a concealed weapon. See Black, 707 F.3d at 540 (police may not proceed on assumption that gun displayed in open-carry jurisdiction may be illegally possessed by convicted felon); see also Northrwp, 785 F.3d at 1132 (same). If that by itself is enough to make a person “dangerous” for Terry purposes, then the legal right to carry arms in public is perfectly self-defeating: The moment a person exercises that right—and has the misfortune to be stopped for a traffic violation or other minor infraction—he opens himself up to being frisked and disarmed, at least temporarily, by law enforcement officers.
The majority insists that this result, putting at cross-purposes Fourth Amendment and gun possession rights, is compelled by the Supreme Court’s holdings in Terry v. Ohio, 392 U.S. at 27, 88 S.Ct. 1868, and Pennsylvania v. Mimms, 434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam). According to the majority, those cases establish that if the police have reasonable suspicion that a suspect is “armed,” then they necessarily have reasonable suspicion that he is “dangerous,” as well, justifying a frisk under Terry’s “armed and dangerous” standard. In other words, when the Supreme Court says “armed and dangerous,” what it really means is “armed and therefore dangerous,” Maj. Op. at 700 or, put more simply, “armed.”
But the Supreme Court for decades has adhered to its conjunctive “armed and dangerous” formulation, giving no indication that “dangerous” may be read out of the equation as an expendable redundancy. See Michigan v. Long, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (approving Terry “frisk” of automobile on reasonable suspicion “that the suspect is dangerous and the suspect may gain immediate control of weapons”) (emphasis added). Indeed, until its latest filing before our en banc court, the government itself understood “armed” and “dangerous” as separate and independent conditions of a lawful Terry frisk. See Gov’t Br. at 16-17. And other courts applying Terry in precisely this context—against a backdrop of state laws that routinely permit the public possession of firearms—have taken the same position, holding that a Terry frisk requires reasonable suspicion that a person is “both armed and a danger to the safety of officers or others.” Leo, 792 F.3d at 748; see Northrwp, 785 F.3d at 1132 (“Clearly established law required [the officer] to point to evidence that [the sus- *710 peet] may have been armed and dangerous, Yet all he ever saw was that [the suspect] was armed—and legally so.”) (emphasis in original) (citation omitted).
It is true, as the majority argues, that the Court in Terry and Mimms was prepared to infer danger from the presence of a concealed firearm. Terry, 392 U.S. at 28, 88 S.Ct. 1868; Mimms, 434 U.S. at 112, 98 S.Ct. 330. But that simply brings us back to our starting point: that in jurisdictions where public possession or concealed carry of guns is illegal, as in Terry, see Northr-wp, 785 F.3d at 1131, or tightly regulated, as in Mimms,[2] there is precious little space between “armed” and “dangerous”— not only because someone carrying a gun probably is breaking the law already, but also because he likely is inclined to commit other crimes with the assistance of the gun. Nobody—including Robinson—doubts that as in Mimms and Terry, a presumptively illegal concealed gun gives rise to a reasonable suspicion of dangerousness, allowing the police to conduct a protective frisk. But those cases simply do not speak to the very different circumstances presented when public gun possession is presumptively legal, see Black, 707 F.3d at 540, and there no longer is reason to believe that a person carrying a gun during a traffic stop is anything but á perfectly law-abiding citizen.
Nor, contrary to the majority’s analysis, Maj. Op. at 700-01, does Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), resolve this issue. Adams does make clear, as the majority emphasizes, that even a lawfully possessed firearm can pose a threat to officer safety. 407 U.S. at 146, 92 S.Ct. 1921. But that point is of limited use here, because nobody is disputing it. Robinson’s argument is not, as the majority would have it, Maj. Op. at 700-01, that any risk of danger posed by a firearm necessarily is “eliminated” if the firearm is legally possessed. Where, as in Adams, an armed man suspected of drug offenses is sitting alone in a parked car at 2:15 a.m. and unwilling to cooperate with the police, everyone agrees that the circumstances give rise to a reasonable suspicion of “dangerousness” regardless of the legal status of the gun. See 407 U.S. at 147-48, 92 S.Ct. 1921. But the question in this case is different: not whether a presumptively lawful gun may give rise to a reasonable suspicion of dangerousness under certain circumstances, but whether it necessarily and automatically does so in every circumstance. On that question, Adams has nothing to say.[3]
The problems with treating “armed and dangerous” as a “unitary” concept, see Cone. Op. at 703, go beyond the mismatch with precedent. As the concurring opinion cogently explains, the logic of Terry frisk doctrine is premised on an independent role for dangerousness: Whether a person in possession of, say, a screwdriver is deemed “armed” under Terry depends en *711 tirely on whether there is separate reason to believe he or she also is “dangerous” and thus might use that screwdriver as a weapon. See Cone. Op. at 703-04; United States v. Matchett, 802 F.3d 1185, 1193 (11th Cir. 2015) (upholding Terry frisk of burglary suspect because burglars frequently are “armed” with tools like screwdrivers).
And though it purports to rely on a common-sense equation of guns with danger, the majority’s approach can embrace that connection only very selectively: An armed citizen in an open-carry jurisdiction necessarily poses a “danger” to the police that justifies a protective frisk if and only if he appears to have committed some offense, however trivial—like the seatbelt violation here—leading to a valid stop. See Maj. Op. at 700-01. If, on the other hand, the police in this case had initiated a consensual encounter with Robinson in the 7-Eleven parking lot, then the gun Robinson was suspected of carrying would not have been grounds for a frisk, as the government conceded at oral argument. Likewise, had Robinson exited the car in which he was a passenger before the police could conduct their pretextual traffic stop, then again he would no longer be “dangerous” for purposes of allowing a Terry frisk, notwithstanding the concealed gun in his pocket. To be sure, as the majority explains, Maj. Op. at 700, Terry doctrine requires that a frisk be attendant to a lawful stop. But if “armed” may be conflated with “dangerous” under Terry, then it is hard to see why an officer’s right to protect him or herself would be made to turn on whether a dangerous person carrying a gun has remembered to fasten his seatbelt.
Most important, by equating “armed” with “dangerous” even in states where the carrying of guns is widely permitted, the majority’s rule has the effect of depriving countless law-abiding citizens of what otherwise would be their Fourth Amendment and other constitutional rights. As the concurring opinion explains, the upshot of the majority’s approach is that citizens who avail themselves of their legal right to carry firearms will be subject to a wide range of “special burdens,” the full extent of which we only can begin to discern. Cone. Op. at 705-06. Certainly, such citizens may be frisked and temporarily disarmed when stopped, even for the most minor of infractions; if they necessarily are “dangerous,” then the police should be free to dispense with' Fourth- Amendment “knóck-and-announce” protections before entering their homes; and when armed and “therefore dangerous” citizens seek to assemble in public, their' First Amendment rights may be restricted based on the risk they are conclusively presumed to pose to public safety. See id. at 705-06. To the concurring opinion’s list, I would add one more: If a police officer reasonably believes that a suspect poses a “threat of serious physical harm,” he may use deadly force to protect himself, see, e.g., Cooper v. Sheehan, 735 F.3d 153, 159 (4th Cir. 2013) (internal quotation marks omitted), and while we have held in the past that the presence of a gun alone does not constitute a “threat,” id. or establish that a suspect is “dangerous” to an officer, Pena v. Porter, 316 Fed.Appx. 303, 311 (4th Cir. 2009) (unpublished), today’s decision insisting on a conclusive link between “armed” and “dangerous” undoubtedly will have implications for police use of force, as well. Those consequences—and others that surely will follow—are profound, both practically and constitutionally, and I would not be so quick to invite them without some direction from the Supreme Court.
But my biggest concern is that these “special burdens”—most relevantly, the Terry frisks at.issue here—will not.be *712 distributed evenly across the population. Mowing police officers making stops to frisk anyone thought to be armed, in a state where the carrying of guns is widely permitted, “creates a serious and recurring threat to the privacy of countless individuals,” Arizona v. Gant, 556 U.S. 332, 345, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) (police may not search a car “whenever an individual is caught committing a traffic offense”). And, critically, it “gives police officers unbridled discretion” to decide which of those legally armed citizens will be targeted for frisks, implicating concerns about the abuse of police discretion that are fundamental to the Fourth Amendment. See id.; Black, 707 F.3d at 541. As Judge Hamilton warned in Williams, once a state legalizes the public possession of firearms, unchecked police discretion to single out anyone carrying a gun gives rise to “the potential for intentional or unintentional discrimination based on neighborhood, class, race, or ethnicity.” 731 F.3d at 694; see also Utah v. Strieff, — U.S. —, 136 S.Ct. 2056, 2070, 195 L.Ed.2d 400 (2016) (Sotomayor, J., dissenting) (“it is no secret that people of color are disproportionate victims” of special police scrutiny).
The government assures that we need not worry about these possible disproportionate effects because a Terry frisk may be conducted only after a stop on reasonable suspicion of “criminal activity”—an “objective standard” that “prevents police stops on hunches alone.” Pet’n for Reh’g En Banc at 13. But that simply is not so, and to understand why not, we need look no further than the facts of this very case. Robinson was not stopped for “criminal activity,” at least as that term generally is understood. As a legal matter, he was stopped because Officer Hudson observed a seatbelt violation—the kind of minor and routine traffic infraction that does next to nothing to narrow the class of legally armed citizens who may be subjected to a frisk at police discretion. And in reality, as Officer Hudson candidly testified at the suppression hearing, Robinson was stopped so that the police could investigate the tip they had received about a black male carrying a concealed firearm. Though Robinson’s gun possession was presumptively lawful in light of West Virginia’s generous public-carry laws, see Black, 707 F.3d at 540, that is, Robinson was stopped precisely because the police had a hunch that his possession in fact might be unlawful.
It is true, as the government argues, that under Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Fourth Amendment permits this kind of pretextual traffic stop, undertaken in order to explore some unsupported hunch. But that is exactly the problem: In light of Whren, the requirement that a valid stop precede a Terry frisk imposes no meaningful limit at all on police discretion. If the police in a public-carry jurisdiction want to target a particular armed citizen for an exploratory frisk, then they need do no more than wait and watch for a moving violation, as in this case—or a parking violation, see United States v. Johnson, 823 F.3d 408, 412 (7th Cir. 2016) (Hamilton, J., dissenting) (describing pre-textual stop for “parking while black”) reh’g en banc granted, opinion vacated (Aug. 8, 2016); or, for the pedestrians among us, a jaywalking infraction, as the government helpfully explained at oral argument—and then make a pretextual stop.
And we should be clear about the degree to which that pretextual stop may be leveraged into a wide-ranging and intrusive investigation. Cf. Strieff, 136 S.Ct. at 2069 (Sotomayor, J., dissenting) (“Although many Americans have been stopped for speeding or jaywalking, few may realize how degrading a stop can be when the officer is looking for more.”) First, of *713 course, is the frisk itself, euphemistically described as a “pat-down” but recognized, since Terry, as a “serious intrusion upon the sanctity of the person” that may extend to a thorough touching of sensitive and private areas of the body. Id. at 2070; Terry, 392 U.S. at 17 & n. 14, 88 S.Ct. 1868. And under Michigan v. Long, 463 U.S. 1032, 1049-50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), reasonable suspicion that the subject of a vehicular stop is armed and dangerous may authorize not only a frisk of the suspect’s person but also a “frisk” of the passenger compartment of the car. So with possession of a firearm in a public-carry state now enough to generate a reasonable suspicion of dangerousness, pretextual stops will allow police officers to target law-abiding gun owners not only for intrusive frisks but also limited car searches, at police discretion and on the basis of nothing more than a minor infraction. That is effectively the same result that the Supreme Court found unacceptable in Gant, 556 U.S. at 345, 129 S.Ct. 1710 (forbidding car searches incident to arrest for minor traffic violations), and it should be no more acceptable here, where a right of constitutional dimension— the right to bear arms—is in the balance.
I recognize the serious concerns for officer safety that underlie the Terry frisk doctrine and the majority’s opinion. Those concerns, as the majority points out, Maj. Op. at 699, may be especially pronounced during traffic stops, see, e.g., Mimms, 434 U.S. at 110-11, 98 S.Ct. 330—though, of course, the majority’s rule is not limited to the context of traffic stops. And I do not doubt that recent legal developments regarding gun possession have made the work of the police more dangerous as well as more difficult. See Williams, 731 F.3d at 694.
In my view, states have every right to address these pressing safety concerns with generally applicable and evenhanded laws imposing modest burdens on all citizens who choose to arm themselves in public. For instance, many states—though not West Virginia—seek to reconcile police safety and a right to public carry through “duty to inform” laws, requiring any individual carrying a weapon to so inform the police whenever he or she is stopped,[4] or in response to police queries.[5] And if a person fails to disclose a suspected weapon to the police as required by state law, then that failure itself may give rise to a reasonable suspicion of dangerousness, justifying a protective frisk.
West Virginia, however, has taken a different approach, permitting concealed carry without the need for disclosure or temporary disarmament during traffic stops. For the reasons described above, I do not believe we may deem inherently “dangerous” any West Virginia citizen stopped for a routine traffic violation, on the sole ground that he is thought to have availed himself fully of those state-law rights to gun possession. Nor, in my view, does the Fourth Amendment allow for a regime in which the safety risks of a policy like West Virginia’s are mitigated by selective and discretionary police spot-checks and frisks of certain legally armed citizens, by way of pretextual stops or otherwise. Cf. Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) (invalidating discretionary spot-checks of drivers for licenses and registrations in furtherance of roadway safety). Absent some “specific, ar- *714 ticulable suspicion of danger” in a particular case, see United States v. Sakyi, 160 F.3d 164, 168-69 (4th Cir. 1998), West Virginia’s citizens, including its police officers, must trust their state’s considered judgment that the benefits of its approach to public gun possession outweigh the risks. See Northrwp, 785 F.3d at 1133.
II.
The majority’s rule is bright-line and broad: Any citizen carrying a gun in a public-carry jurisdiction is “armed” and also per se “dangerous” under Terry, regardless of surrounding circumstances, Maj. Op. at 701. The majority goes on, however, to consider the particular facts surrounding Robinson’s stop, and concludes that they confirm a reasonable suspicion of dangerousness. Id. at 701-02. Though this portion of the majority’s opinion appears to be dicta unnecessary to its holding, I respectfully note my disagreement.
To be clear, I have no quarrel with the majority’s premise: that under certain circumstances, even a lawfully possessed firearm can give rise to a reasonable suspicion of dangerousness. See Adams, 407 U.S. at 146, 92 S.Ct. 1921. And so it is incumbent on me to consider whether the frisk in this case was justified in light not only of reasonable suspicion that Robinson was armed—insufficient by itself—but also of the surrounding circumstances. But like the magistrate judge who conducted Robinson’s suppression hearing, I do not believe that either of the factors cited by the government and the majority—Robinson’s presence in a high-crime neighborhood, or his “evasive response” when asked if he had a gun—is probative of dangerousness in the context of this case. Taking all of the circumstances together, I see no “particularized and objective basis” for believing that Robinson was dangerous as well as armed. See United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (internal quotation marks omitted).
The suppression hearing in this case was conducted by a magistrate judge, who heard testimony from all of the officers involved in the events leading up to Robinson’s frisk. In recommending suppression, the magisti’ate judge evaluated the full circumstances surrounding Robinson’s frisk, including both the “high-crime” status of the apartment complex next to the 7-Eleven at which Robinson was seen loading his weapon and Robinson’s conduct during the traffic stop. According to the magistrate judge, the testimony at the hearing indicated that Robinson was fully cooperative with the police, who perceived no “furtive gestures” or movements suggesting an intent to reach for a weapon. J.A. 131. And based on all of the evidence before him, the magistrate judge concluded that the government had failed to “articulate any specific fact, other than [Robinson’s] possession of a firearm in a high crime neighborhood, a legal activity in the state of West Virginia, which would justify the officer’s suspicion that [Robinson] was dangerous.” Id. at 138.
The district court, of course, rejected the magistrate judge’s report and recommendation and denied the suppression motion. But because the district coui't did not conduct a second hearing, this case must be decided on the record created before the magistrate judge, And on that record, I see no reason for second-guessing the magistrate judge’s determination that the government’s witnesses “testified to no objective and particularized facts demonstrating that [Robinson] was dangerous at the time of the traffic stop.” Id. at 137.
It is true, as the magistrate judge carefully reviewed, that police officers provided testimony that an apartment complex adjacent to the 7-Eleven at issue is considered *715 a high crime area, and that crime from that complex often “spilled over” into the 7-Eleven parking lot where Robinson was seen, “as evidenced by shoplifting, thefts and drug trafficking activities.” Id. at 130. And it is clear, ás the magistrate judge recognized, that presence in a high-crime area may contribute to a finding of reasonable suspicion. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).
But as our cases have indicated, the relative significance of a high-crime area, like other reasonable suspicion factors, is context-specific. In some cases, for instance,, we have sustained a Terry frisk because it occurred in a high-crime area late at night. See, e.g., George, 732 F.3d at 300. In Black, however, we rejected a position substantially the same as the government’s here: that even if public gun possession alone does not justify a Terry stop where the law permits the open carry of firearms, gun possession in a high-crime area would be sufficiently “suspicious” to do so. 707 F.3d at 542.
Black should govern here. Whether or not a high-crime environment might make other ambiguous conduct—for instance, fleeing from a police officer, see Wardlow, 528 U.S. at 124,120 S.Ct. 673—more likely to be criminal or dangerous, it sheds no light on the likelihood that an individual’s presumptively legal gun possession poses a danger to the police. That is because where public gun possession is permitted, high-crime areas are exactly the setting in which we should most expect to see law-abiding citizens carrying guns; there is more, not less, reason to arm oneself lawfully for self-defense in a high-crime area. Cf McDonald, 561 U.S. at 790, 130 S.Ct. 3020 (“[T]he Second Amendment right protects the rights of minorities and other residents of high-crime areas.”). Presence in a high-crime area, in other words, is as likely an explanation for innocent and non-dangerous gun possession as it is an indication that gun possession is illegal or dangerous, and it does nothing to help the police tell the difference.
As discussed above, in states allowing the public possession of weapons, authorizing a Terry pat-down whenever there is reasonable suspicion that a person is armed, and in connection with a stop for any minor violation, would give the police unchecked discretion in deciding which armed citizens to frisk. Allowing such automatic frisks only in high-crime areas would do nothing to address that concern. Instead, it would guarantee that the costs of such intrusions are borne disproportionately by the racial minorities and less affluent individuals who today are most likely to live and work in neighborhoods classified as high-crime, See Black, 707 F.3d at 542. Given the lack of probative value associated with a high-crime area when it comes to gun possession, there- is no justification for adopting such a rule, “The new constitutional and statutory rights for individuals to bear arpas at home and in public apply to all,” and “[t]he courts have an obligation to protect those rights” in neighborhoods labeled “bad” as well as “good.” Williams, 731 F.3d at 694 (Hamilton, J., concurring).
Apart from the high-crime neighborhood, the majority, like the government, puts primary reliance on Robinson’s “evasive response” when asked by Captain Roberts whether he was carrying a firearm. Maj. Op. at 701-02. But according to the officers’ testimony, Robinson was cooperative throughout his encounter with the police, and never made any inconsistent statements indicating nervousness. And the magistrate judge found—without dispute by the district court—that - Captain Roberts’s inquiry to Robinson came virtually simultaneously with the frisk itself: *716 Roberts “asked [Robinson] if he had any firearms on his person as [Robinson] was exiting the vehicle,” and upon perceiving a “weird look,” ordered Robinson to place his hands on top of the car and conducted the frisk. J.A. 118. Even construing this evidence in the light most favorable to the government, there was a very limited time window during which Robinson could have responded before the frisk made the question moot, and his failure to interject an answer immediately did not provide an objective indication that he was about to abandon his cooperative posture and become dangerous.[6]
That is particularly so given that West Virginia does not require that people carrying firearms inform the police of their guns during traffic or other stops, even if asked. See supra at 50. Where a state has decided that gun owners have a right to carry concealed weapons without so informing the police, gun owners should not be subjected to frisks because they stand on their rights. CF. Northrwp, 785 F.3d at 1132 (“impropriety” of officer’s demand to see permit for gun being brandished in public is “particularly acute” where state has not only legalized open carry of firearms but also “does not require gun owners to produce or even carry their licenses for inquiring officers”). Under a different legal regime, different inferences could be drawn from a failure to answer an officer’s question about a gun. See supra at 50-11. But I do not think we may presume dangerousness from a failure to waive—quickly enough—a state-conferred right to conceal a weapon during a police encounter.
Again, I recognize that expanded rights to openly carry or conceal guns in public will engender genuine safety concerns on the part of police officers, as well as other citizens, who more often will find themselves confronting individuals who may be armed. But where a sovereign state has made the judgment that its citizens safely may arm themselves in public, I do not believe we may presume that public gun possession gives rise to a reasonable suspicion of dangerousness, no matter what the neighborhood. And because the rest of the circumstances surrounding this otherwise unremarkable traffic stop do not add appreciably to the reasonable suspicion calculus, I must conclude that the police were without authority to frisk Robinson under Terry’s “armed and dangerous” standard. Accordingly, I dissent.

. We have held that in jurisdictions generally allowing public gun possession, police testimony that few law-abiding citizens take advantage of that right is not enough to establish reasonable suspicion for a Terry stop when a gun is publicly displayed. See Black, 707 F.3d at 540. But even assuming that such testimony might bear on the separate “dangerousness” inquiry under Terry, none was offered at this suppression hearing.

. At the time of the events in Mimms, local law appears to have strictly limited the public possession of firearms, allowing it only in certain narrow circumstances. See 1943 Pa. Laws 487; 1972 Pa. Laws 1577.

. Nor does Michigan v. Long, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), on which the majority also relies. In a footnote, Long cites Adams for the proposition that a person in legal possession of a weapon—in Long, a knife—may pose a risk of danger to the police. Id. at 1052 n.16, 103 S.Ct. 3469. But the Court's approval of the frisk in Long rested not only on the presence of a weapon, but also on an independent finding that under all the circumstances of the case—featuring a suspect who drove at excessive speed, swerved into a ditch, refused initially to cooperate, and appeared to be intoxicated—the officers were "clearly justified” in their "reasonable belief that Long posed a danger” to their safety. Id. at 1050, 103 S.Ct, 3469.

. See, e.g., Alaska Stat. § 11.61.220; La. Stat. § 40:1379.3; Neb. Rev. Stat. § 69-2440; N.C. Gen. Stat. § 14-415.11; Oída. Stat. tit. 21, § 1290.8.

. See, e.g,, Ariz. Rev, Stat. § 13-3112; Ark. Code § 5-73-315; 430 Ill. Comp. Stat, 66/10; S.C. Code § 23-31-215.

. The majority appears also to credit the "weirdness” of Robinson’s look, as understood by Captain Roberts, as indicative of evasiveness or perhaps dangerousness itself. Maj. Op. at 701-02. On this point, I must agree with the magistrate judge: Captain Roberts’s perception that through his look Robinson actually was saying, ”[0]h, crap,” "I don’t want to lie to you, but I’m not going to tell you anything,” J.A. 89, is sufficiently subjective that it cannot constitute an objective or articulable factor supporting reasonable suspicion of anything.