**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 14-4902**

───────────

UNITED STATES OF AMERICA,

            Plaintiff - Appellee,

      v.

SHAQUILLE MONTEL ROBINSON,

            Defendant - Appellant.

───────────

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg.  Gina M. Groh, Chief District Judge.  (3:14-cr-00028-GMG-RWT-1)

───────────

Argued:  October 29, 2015            Decided:  February 23, 2016

───────────

Before NIEMEYER and HARRIS, Circuit Judges, and DAVIS, Senior Circuit Judge.

───────────

Reversed and vacated by published opinion.  Judge Harris wrote the opinion, in which Senior Judge Davis joined.  Judge Niemeyer wrote a dissenting opinion.

───────────

**ARGUED:**  Nicholas Joseph Compton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant.  Jarod James Douglas, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.  **ON BRIEF:**  Kristen M. Leddy, Research and Writing Specialist, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant.  William J. Ihlenfeld, II, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

PAMELA HARRIS, Circuit Judge:

On an afternoon in 2014, the Ranson, West Virginia police department received an anonymous tip that a black man had loaded a gun in a 7-Eleven parking lot and then concealed it in his pocket before leaving in a car. A few minutes later, the police stopped a car matching the description they had been given, citing a traffic violation. Shaquille Montel Robinson, a black man, was a passenger in the car. After Robinson exited the vehicle at police request, an officer frisked Robinson and discovered a firearm in the pocket of Robinson's pants.

Under Terry v. Ohio, 392 U.S. 1 (1968), the police may conduct a limited pat-down for weapons when there is reasonable suspicion that a suspect is both armed and dangerous. "Armed" is not a problem in this case: Assuming the credibility of the anonymous tip, which we may for purposes of this appeal, the police had reason to believe that Robinson was armed when they stopped him. But "dangerous" is more difficult, and what makes it difficult is that West Virginia law authorizes citizens to arm themselves with concealed guns. Because the carrying of a concealed firearm is not itself illegal in West Virginia, and because the circumstances did not otherwise provide an objective basis for inferring danger, we must conclude that the officer who frisked Robinson lacked reasonable suspicion that Robinson was not only armed but also dangerous. Accordingly, we reverse

2

the district court decision denying Robinson's motion to suppress the evidence uncovered by this unlawful search.

**I.**

**A.**

At 3:55 p.m. on March 24, 2014, the Ranson police department forwarded an anonymous call to Officer Crystal Tharp. At a hearing conducted by the magistrate judge, Tharp testified that the caller "advised that he had witnessed a black male in a bluish greenish Toyota Camry load a firearm, conceal it in his pocket, and there was a white female driver." J.A. 43. The caller indicated that the car had just left the location, which he identified as the parking lot of a 7-Eleven on North Mildred Street. Immediately adjacent to that 7-Eleven is the Apple Tree Gardens apartment complex, regarded by the officers in this case as the highest-crime area in Ranson.

The caller advised that the Camry had headed south on North Mildred Street. Two officers, Captain Robbie Roberts and Officer Kendall Hudson, separately left the station to find the car. Officer Hudson spotted a car matching the description traveling on North Mildred Street, and noticed that the two occupants were not wearing seatbelts, a traffic violation under West Virginia law. Relying on the seatbelt violation, he pulled over the car, approximately two to three minutes after the

3

anonymous call had been received and roughly three-quarters of a mile from the 7-Eleven.

Officer Hudson approached the driver's side of the car with his weapon drawn and asked the female driver for her license and registration. She complied. At the hearing before the magistrate judge, Hudson testified that he also initially asked Robinson for his identification, but then realized that asking him to reach into his pocket was "probably not a good idea" because "[t]his guy might have a gun." J.A. 66. Instead, Hudson asked Robinson to step out of the car.

At this point, Captain Roberts had arrived at the scene as backup. Roberts testified that he approached Robinson and opened the passenger-side door. As Robinson was exiting the car, Roberts asked Robinson if he had any weapons. In response, Roberts testified, Robinson gave a "weird look." J.A. 88. Roberts ordered Robinson to put his hands on top of the car and began to frisk him for weapons, discovering a firearm in Robinson's pants pocket.

Captain Roberts whispered "gun" to Officer Hudson, and Hudson handcuffed Robinson and ordered him to sit on the sidewalk. According to the officers' testimony, Robinson was cooperative throughout his encounter with the police, and made no furtive gestures or movements suggesting that he intended to reach for a weapon. After frisking him, however, Roberts

4

recognized Robinson from prior criminal proceedings and confirmed that Robinson was a convicted felon.

**B.**

A grand jury in the Northern District of West Virginia indicted Robinson on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Robinson moved to suppress the evidence against him — the gun recovered during the traffic stop of March 24 — on the ground that the frisk was unlawful. The district court referred the motion to a magistrate judge for a report and recommendation.

The magistrate judge conducted a hearing, taking testimony from all of the officers involved in the events of March 24: Officer Tharp, Officer Hudson, and Captain Roberts. A fourth officer, Trooper D.R. Walker, testified as to the high level of criminal activity at the Apple Tree Garden apartment complex next to the 7-Eleven at which Robinson had been seen loading his weapon. Following the hearing, the magistrate judge issued a report that recommended granting Robinson's motion to suppress.

The magistrate judge agreed with the government that the initial stop of the car was justified by the observed seatbelt violation. But the frisk, the magistrate judge concluded, was not supported by a "reasonable belief that [Robinson] [was] armed and presently dangerous," as required to justify a pat-

5

down for weapons under Terry. J.A. 124 (quoting Ybarra v. Illinois, 444 U.S. 85, 86 (1979)). The problem, the magistrate judge explained, was that in light of West Virginia law allowing for both open and concealed carrying of loaded guns, "the content of the tip provided to the police, while reporting the individual was armed, does not contain any information demonstrating that the individual was engaging in any objective or particularized dangerous behavior." J.A. 136 (emphasis added) (internal quotation marks omitted).

The magistrate judge also considered the facts surrounding the officers' encounter with Robinson, including the "high-crime" status of the apartment complex next to the 7-Eleven. Based on the officers' testimony, the magistrate judge concluded that both the car's driver and Robinson were cooperative throughout, and that Robinson had made no "furtive gestures, movements or inconsistent statements" suggesting nervousness or an intent to reach for a weapon. J.A. 131. Apart from what one officer perceived as a "weird look" — which the magistrate judge deemed a "subjective impression" insufficient to justify a frisk, J.A. 137 — the magistrate judge concluded that the government had failed to "articulate any specific fact, other than [Robinson's] possession of a firearm in a high crime neighborhood, a legal activity in the state of West Virginia,

which would justify the officer's suspicion that [Robinson] was dangerous." J.A. 138.

After the government submitted objections, the district court rejected the magistrate judge's report and recommendation in relevant part and denied the suppression motion. Because it did not conduct a second hearing, the district court relied on the record created before the magistrate judge. And in the district court's view, a reasonable suspicion that Robinson was armed in a high-crime area, when combined with Robinson's failure to answer when asked by an officer if he was armed, translated to a reasonable suspicion that Robinson was dangerous.

Robinson conditionally pleaded guilty to being a felon in possession of a firearm, preserving his right to appeal the denial of his suppression motion, and was sentenced to 37 months of incarceration. This timely appeal followed.

## II.

In reviewing the denial of a motion to suppress, we examine the district court's factual findings for clear error and its legal conclusions de novo. United States v. Elston, 479 F.3d 314, 317 (4th Cir. 2007). We view the evidence in the light most favorable to the government, as the prevailing party before

the district court.  United States v. Black, 707 F.3d 531, 534 (4th Cir. 2013).

## A.

This case is governed by the familiar two-part standard of Terry v. Ohio, which considered the lawfulness of "stop and frisk" procedures under the Fourth Amendment.  392 U.S. 1. Under Terry, an officer may conduct a brief investigatory "stop" — including a traffic stop, see Arizona v. Johnson, 555 U.S. 323, 330–32 (2009) — based on reasonable suspicion of criminal activity, without the need for a warrant or probable cause. Terry, 392 U.S. at 30; see, e.g., United States v. Holmes, 376 F.3d 270, 275 (4th Cir. 2004).  But a valid stop does not automatically entitle an officer to conduct a "frisk," or protective pat-down of outer clothing for weapons.  See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (officer "must have justification for a frisk or a 'pat-down' beyond the mere justification for [a] traffic stop").  Rather, because a frisk is a "serious intrusion upon the sanctity of the person," Terry, 392 U.S. at 17, it is subject to a separate standard: The police may frisk a person who has been legally stopped only if the officer has a reasonable and articulable suspicion that the person is "armed and presently dangerous to the officer or to others."  Id. at 24; Holmes, 376 F.3d at 275.

8

In deciding whether a frisk is justified, we "examine the 'totality of the circumstances' to determine if the officer had a 'particularized and objective basis' for believing that the detained suspect might be armed and dangerous." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). As the district court noted, multiple factors may together create reasonable suspicion that a suspect is armed and dangerous even if none of them would be sufficient taken alone. Id. at 300. The standard is objective, so a frisking officer's subjective impressions are not relevant to our analysis. Id. at 299; United States v. Hernandez-Mendez, 626 F.3d 203, 212 (4th Cir. 2010).

Here, Robinson does not contest the validity of the initial traffic stop by Officer Hudson. Nor could he. As the magistrate judge explained, under Whren v. United States, 517 U.S. 806 (1996), approving "pretextual" stops under the Fourth Amendment, evidence of a seatbelt violation justified the stop regardless of whether the officer actually was motivated by the anonymous tip. Accordingly, the only question we must decide is whether the subsequent frisk was lawful — that is, whether the officers had reasonable suspicion that Robinson was "armed and dangerous." And our inquiry is narrower still because Robinson does not dispute reasonable suspicion that he was "armed," choosing not to contest the reliability of the anonymous tip to

9

the police.[1]  All that remains for us to decide is whether there was reasonable suspicion that Robinson was "dangerous."[2]  For the reasons set out below, we conclude that there was not.

---

[1] Though Robinson addressed the issue in his brief, at oral argument he expressly declined to rely on any challenge to the reliability of the anonymous tip.  Accordingly, for purposes of this appeal, we will assume without deciding that the tip was reliable.

[2] Our dissenting colleague suggests that we may dispense with this inquiry entirely, because when the Supreme Court says "armed and dangerous" what it really means is "armed and thus dangerous" — or, put more simply, "armed."  See post at 9-14.  But the government does not dispute that "armed" and "dangerous" are separate and independent conditions of a lawful Terry frisk.  See Gov't Br. at 16-17 (given reasonable suspicion that Robinson was armed, "the dispositive issue becomes whether a reasonable prudent . . . officer would be warranted in the belief that his safety . . . was in danger").  We think that is a wise concession.  The Supreme Court for decades has adhered to its conjunctive "armed and dangerous" formulation, giving no indication that "dangerous" may be read out of the equation as an expendable redundancy.  Indeed, where the Court has elaborated, it has highlighted the independent role of "dangerousness," holding in Michigan v. Long, 463 U.S. 1032 (1983), that Terry authorizes a "frisk" of an automobile when a police officer possesses reasonable suspicion "that the suspect is dangerous and the suspect may gain immediate control of weapons," id. at 1049.  Like other courts applying Terry in jurisdictions that routinely permit the public possession of firearms, we take the Supreme Court at its word:  A Terry frisk requires reasonable suspicion that a person is "both armed and a danger to the safety of officers or others."  United States v. Leo, 792 F.3d 742, 748 (7th Cir. 2015); see Northrup v. City of Toledo Police Dep't, 785 F.3d 1128, 1132 (6th Cir. 2015) ("Clearly established law required [the officer] to point to evidence that [the subject] may have been armed and dangerous.  Yet all he ever saw was that [the subject] was armed — and legally so.") (emphasis in original) (internal citation and quotation marks omitted).

10

**B.**

All parties agree that the anonymous tip to the police, giving rise to a reasonable suspicion that Robinson was carrying a loaded and concealed firearm, is critical to the government's case on dangerousness. Accordingly, we start with the tip, and consider first whether reasonable suspicion that Robinson was armed, in and of itself, generated reasonable suspicion of dangerousness sufficient to justify a Terry frisk.

In a different time or jurisdiction, it might well have. If carrying a concealed firearm were prohibited by local law, then a suspect concealing a gun in his pocket by definition would be presently engaged in criminal activity involving a deadly weapon. And where local law tightly regulates the concealed carry of firearms, permitting it only in rare cases, then a concealed gun may remain a strong indication of criminal activity. In those circumstances, there is precious little space between "armed" and "dangerous," and a police officer may be justified in conducting a Terry frisk on reasonable suspicion that a suspect is concealing a gun. Indeed, Terry itself, approving a protective frisk where an officer had reason to believe a robbery suspect was armed with a concealed handgun, see 392 U.S. at 24, was decided at a time when handgun

11

possession was illegal. See Northrup v. City of Toledo Police Dep't, 785 F.3d 1128, 1131 (6th Cir. 2015) (Sutton, J.).[3]

But times have changed, and we decide this case against a different legal background. As Officer Tharp testified, none of the conduct reported in the anonymous tip she received — that a man had loaded a gun in the parking lot of a 7-Eleven and then concealed it in his pocket before leaving in a car — is currently illegal under West Virginia law. On the contrary, in West Virginia it is legal to carry a gun in public, see W. Va. Code § 61-7-3; United States v. Perkins, 363 F.3d 317, 327 (4th Cir. 2004), and it is legal to carry a concealed firearm with a permit, see W. Va. Code §§ 61-7-3, 61-7-4. And permits are relatively easy to obtain; West Virginia is a "shall issue" state, in which the sheriff must issue a license to any applicant who submits a complete and accurate application, pays the $75 fee, and certifies that he or she meets certain basic requirements, such as age and training. Id. § 61-7-4. Today in West Virginia, in other words, there is no reason to think that public gun possession is unusual, or that a person carrying or

---

[3] Similarly, Pennsylvania v. Mimms, 434 U.S. 106 (1977), a per curiam opinion on which the dissent relies, arose from an arrest at a time when local law appears to have strictly limited the public possession of firearms, allowing it only in narrow circumstances. See 1943 Pa. Laws 487; 1972 Pa. Laws 1577.

concealing a weapon during a traffic stop is anything but a law-abiding citizen who poses no danger to the authorities.

"[A]s public possession and display of firearms become lawful under more circumstances, Fourth Amendment jurisprudence and police practices must adapt." United States v. Williams, 731 F.3d 678, 691 (7th Cir. 2013) (Hamilton, J., concurring). Within the last decade, federal constitutional law has recognized new Second Amendment protections for individual possession of firearms, see McDonald v. City of Chicago, 561 U.S. 742 (2010); District of Columbia v. Heller, 554 U.S. 570 (2008), and state law has followed, providing expanded rights to carry guns in public, see Williams, 731 F.3d at 691. And as conduct once the province of law-breakers becomes increasingly commonplace, courts must reevaluate what counts as suspicious or dangerous behavior under Terry when it comes to public possession of guns. See Northrup, 785 F.3d at 1132–33.

We have recognized as much already, holding in United States v. Black that when a state authorizes the open display of firearms, public possession of a gun is no longer suspicious in a way that would authorize a Terry stop. 707 F.3d at 539–40. "Permitting such a justification," we explained, "would eviscerate Fourth Amendment protections for lawfully armed individuals in those states." Id. at 540. Several of our sister circuits have reached similar conclusions. In Northrup,

13

for instance, the Sixth Circuit held that where state law permits the open carry of firearms, the police are not authorized by Terry to conduct a stop or frisk of a person brandishing a gun in public. 785 F.3d at 1131–33. Likewise, in United States v. Ubiles, 224 F.3d 213, 218 (3d Cir. 2000), the Third Circuit invalidated a Terry stop based on the suspicion of gun possession at a street festival because local law permitted public possession of firearms: "For all the officers knew, even assuming the reliability of the tip that [the defendant] possessed a gun, [the defendant] was another celebrant lawfully exercising his right under Virgin Islands law to possess a gun in public." Id. at 218. And in United States v. Leo, 792 F.3d 742 (7th Cir. 2015), the Seventh Circuit quoted approvingly from Judge Hamilton's concurrence in Williams, id. at 752, and held that in a "concealed-carry" state, the police could neither Terry "frisk" nor search a backpack in a preschool parking lot on the suspicion that it contained a gun, id. at 749–50, 751–52 (rejecting search of backpack in light of "important developments in Second Amendment law together with Wisconsin's [concealed-carry] gun laws").

Applying the same reasoning, we conclude that in states like West Virginia, which broadly allow public possession of firearms, reasonable suspicion that a person is armed does not by itself give rise to reasonable suspicion that the person is

14

dangerous for Terry purposes. Where the state legislature has decided that its citizens may be entrusted to carry firearms on public streets, we may not make the contrary assumption that those firearms inherently pose a danger justifying their seizure by law enforcement officers without consent. Cf. Northrup, 785 F.3d at 1133 (police have "no authority to disregard" the decision of the legislature to allow public possession of guns by using such possession to justify Terry stops and frisks). Nor will we adopt a rule that "would effectively eliminate Fourth Amendment protections for lawfully armed persons," id. at 1132 (citation and quotation marks omitted), authorizing a personally intrusive frisk whenever a citizen stopped by the police is exercising the constitutional right to bear arms. See id.; Black, 707 F.3d at 540.

Allowing police officers making stops to frisk anyone who is thought to be armed, in a state where the carrying of guns is widely permitted, would "create[] a serious and recurring threat to the privacy of countless individuals," Arizona v. Gant, 556 U.S. 332, 345 (2009) (holding that police may not search a car "whenever an individual is caught committing a traffic offense"). It also would "giv[e] police officers unbridled discretion" to decide which of those legally armed citizens to target for frisks, implicating concerns about abuse of police discretion that are central to the Fourth Amendment. See id.;

15

Black, 707 F.3d at 541.  As Judge Hamilton warned in Williams, once a state legalizes the public possession of firearms, unchecked police discretion to single out anyone carrying a gun gives rise to "the potential for intentional or unintentional discrimination based on neighborhood, class, race, or ethnicity."  731 F.3d at 694.

Those concerns are especially pressing in the context of traffic stops like the one in this case.  Under Whren, on which the government relies here, the police may conduct a pretextual stop for a routine traffic violation — like Robinson's seatbelt violation — when their real motive is to investigate some other unsupported hunch.  517 U.S. at 813.  And under Michigan v. Long, 463 U.S. 1032 (1983), reasonable suspicion that the subject of such a traffic stop is armed and dangerous may authorize not only a frisk of the suspect's person but also a "frisk" of the passenger compartment of the car.  Id. at 1049–50.  So if public possession of a firearm in an open- or concealed-carry state were enough to generate a reasonable suspicion of dangerousness, then pretextual traffic stops would allow police officers to target perfectly law-abiding gun owners for frisks and also limited car searches, at police discretion and on the basis of nothing more than a traffic violation.  That is effectively the same result that the Supreme Court found unacceptable in Gant, 556 U.S. at 345 (forbidding car searches

16

incident to arrest for minor traffic violations), and it is no more acceptable here.

We recognize that in this case, Robinson's possession of a gun was not in fact legal because Robinson was a convicted felon. But a frisk must be justified on the basis of "what the officers knew before they conducted their search," see Florida v. J.L., 529 U.S. 266, 271 (2000) (emphasis added), and at the time of the frisk, Captain Roberts had no reason to suspect Robinson of a prior felony conviction. Nor, we have made clear, does the mere chance that a gun may be possessed in violation of some legal restriction satisfy Terry: Where it is lawful to possess a gun, unlawful possession "is not the default status." Black, 707 F.3d at 540; accord Northrup, 785 F.3d at 1132 (quoting Black, 707 F.3d at 540); Ubiles, 224 F.3d at 217–18.

We also recognize, of course, the serious concerns for officer safety that underlie the Terry frisk doctrine and may be especially pronounced during traffic stops. See, e.g., Pennsylvania v. Mimms, 434 U.S. 106, 110–11 (1977) (per curiam) (police may order driver out of vehicle during traffic stop to protect officer safety). And we do not doubt that recent legal developments regarding gun possession have made the work of the police more dangerous as well as more difficult. See Williams, 731 F.3d at 694. Several states — though not West Virginia — have responded to this concern with "duty to inform" laws, which

17

require individuals carrying concealed weapons to disclose that fact to the police if they are stopped. See, e.g., Alaska Stat. § 11.61.220; La. Stat. § 40:1379.3; Neb. Rev. Stat. § 69-2440; N.C. Gen. Stat. § 14-415.11; Okla. Stat. tit. 21, § 1290.8.[4] And where the police have reasonable suspicion that a person is armed, that person's failure to so inform the police, as required by law, may well give rise to a reasonable suspicion of dangerousness.

But as we have explained, under Supreme Court precedent, a more "generalized risk to officer safety" during traffic stops is not enough to justify the intrusion worked by a frisk. Sakyi, 160 F.3d at 168–69. The Supreme Court has struck a different balance, authorizing a protective frisk only on a "specific, articulable suspicion of danger" in a particular case. Id. at 168. And for the reasons given above, once state law routinely permits the public possession of weapons, the fact that an individual is armed, in and of itself, is not an objective indication of danger. Absent some other basis for suspecting danger — a question to which we turn next — police officers must put their trust in West Virginia's considered

---

[4] Other states — though again, it seems, not West Virginia — require those carrying or concealing firearms to disclose that fact to the police in response to a police question, but not otherwise. See, e.g., Ariz. Rev. Stat. § 13-3112; Ark. Code § 5-73-315; 430 Ill. Comp. Stat. 66/10; S.C. Code § 23-31-215.

18

judgment that its citizens may safely carry concealed weapons in public and during traffic stops.  See Northrup, 785 F.3d at 1133 (responding to government argument that prohibiting stop and frisk of individual carrying a gun would leave officer with no recourse but to "hope that [the suspect] was not about to start shooting":  "[This] hope . . . remains another word for the trust that Ohioans have placed in their State's approach to gun licensure and gun possession.").

## C.

Because West Virginia authorizes the public carrying of weapons, reasonable suspicion that Robinson was armed did not by itself justify a Terry frisk.  But even a lawfully possessed firearm can pose a threat to officer safety, and so we also must consider whether a frisk was authorized in light not only of reasonable suspicion that Robinson was armed but also of the surrounding circumstances.  See Adams v. Williams, 407 U.S. 143, 146 (1972) (Terry frisk may be conducted on reasonable suspicion that a suspect is "armed and presently dangerous," regardless of whether "carrying a concealed weapon violate[s] any applicable state law").[5]  The government relies on two additional factors:

---

[5] We have no quarrel with the dissent's observation that a gun may be dangerous to a police officer whether or not it is legally possessed.  See post at 15.  Where, for instance, there is not only reasonable suspicion that a person is armed but also reasonable suspicion that he is engaged in a drug offense or

19

Robinson's failure to answer when asked by Captain Roberts if he had a gun, and Robinson's presence in a high-crime area. We conclude that in the context of this case, neither is probative of dangerousness, and that the totality of the circumstances, taken together, see George, 732 F.3d at 300 (reasonable suspicion depends on totality of the circumstances, taken together), did not authorize the frisk of Robinson.[6]

---

some other serious crime, or there are other objective indicia of danger, then a Terry frisk may be justified whatever the legal status of the gun in question, consistent with Adams. See 407 U.S. at 147-48 (armed subject of frisk suspected of drug offenses, sitting alone in car at 2:15 a.m., and unwilling to cooperate with police). So in the many cases in which the police stop individuals they believe to be armed on reasonable suspicion of an actual crime, there may well be enough to show reasonable suspicion that the suspect is dangerous as well as armed. What makes this case different, however, is that the only "crime" of which the police reasonably suspected Robinson was a seatbelt violation; the government has never argued that there was reasonable suspicion of any other crime, nor that danger to the police may be inferred from a person's failure to wear a seatbelt.

[6] The government contends that our totality-of-the-circumstances analysis must take account of the actual reason for the stop — investigation of a tip regarding gun possession — and not the pretextual reason on which the government relies to justify the stop — a seatbelt violation. For the proposition that it can have it both ways under Whren, the government can cite only an unpublished decision from our circuit that does not address the issue directly. Without deciding the question here, we may assume that the government is correct for purposes of this appeal, and we will consider the anonymous tip along with the other circumstances surrounding the traffic stop.

The government first argues — and the district court agreed — that Robinson's non-answer when asked by Captain Roberts if he was carrying a gun contributed to reasonable suspicion that Robinson was dangerous. Taking the full context into account, as we must, and in light of both the rapidity with which events unfolded and the fact that Robinson was under no legal obligation to inform the police of his weapon, we think that the government's contention gives too much significance to Robinson's failure to tell the officers that he was armed.

According to the officers' testimony before the magistrate judge, Robinson was cooperative throughout his encounter with the police, and he never made any gesture that they construed as reaching for a weapon. And the magistrate judge found — without dispute by the district court — that Captain Roberts's inquiry to Robinson came virtually simultaneously with the frisk itself: Roberts "asked [Robinson] if he had any firearms on his person as [Robinson] was exiting the vehicle," and upon perceiving a "weird look," ordered Robinson to place his hands on top of the car and conducted the frisk. J.A. 118. Even construing this evidence in the light most favorable to the government, there was a very limited time window during which Robinson could have responded before the frisk made the question moot, and his failure to interject an answer quickly enough did not provide an

21

objective indication that he was about to abandon his cooperative posture and become dangerous.[7]

That is particularly so given that West Virginia does not appear to require that people carrying firearms inform the police of their guns during traffic or other stops. Where a state has decided that gun owners have the right to carry concealed weapons without so informing the police, it would be inconsistent with that legislative judgment to subject gun owners to frisks because they stand on their rights. Cf. Northrup, 785 F.3d at 1132 ("impropriety" of officer's demand to see permit for gun being brandished in public is "particularly acute" where state has not only legalized open carry of a firearm but also "does not require gun owners to produce or even carry their licenses for inquiring officers"). Again, we recognize that under a different legal regime, different reasonable inferences could be drawn from a failure to answer an officer's question about a gun. See supra at 17–18. But in light of West Virginia law, and under all of the circumstances

---

[7] We note that the government does not emphasize the "weird look" in its argument. Nor do we understand the district court to have given significant weight to the "weird look" in its analysis. In our view, Captain Roberts's perception that through his look Robinson was saying, "[O]h, crap," "I don't want to lie to you, but I'm not going to tell you anything," J.A. 89, was sufficiently subjective that it cannot constitute an objective or articulable factor supporting reasonable suspicion of dangerousness.

of this case, Robinson's failure to respond immediately to Captain Roberts's question does not add appreciably to the reasonable suspicion calculus.

The government also relies on the fact that the relevant conduct in this case — the loading of a gun in a 7-Eleven parking lot and the stop of the car approximately three-quarters of a mile away — happened in or near a "high-crime area." And the Supreme Court indeed has held that presence in a high-crime area may contribute to a finding of reasonable suspicion. Illinois v. Wardlow, 528 U.S. 119, 124 (2000). Under the circumstances here, however, we conclude that this factor does not lend support to an inference that Robinson was a danger to the police.

As our cases have indicated, the relative significance of a high-crime area, like other reasonable suspicion factors, is context-specific. In some cases, for instance, we have sustained a Terry frisk in part because it occurred in a high-crime area late at night. See, e.g., George, 732 F.3d at 300. In Black, however, we rejected a position substantially the same as the government's here: that even if public gun possession alone does not justify a Terry stop where the law permits the

23

open carrying of firearms, gun possession in a high-crime area at night would be sufficient.  707 F.3d at 542.[8]

We think that Black applies here.  Whether or not a high-crime environment might make other ambiguous conduct — for instance, fleeing from a police officer, see Wardlow, 528 U.S. at 124 — more likely to be criminal or dangerous, we conclude that it sheds no light on the likelihood that an individual's gun possession poses a danger to the police.  Where public gun possession is legal, high-crime areas are precisely the setting in which we should most expect to see law-abiding citizens who present no threat to officers carrying guns; there is more, not less, reason to arm oneself lawfully for self-defense in a high-crime area.  Cf. McDonald, 561 U.S. at 790 ("[T]he Second Amendment right protects the rights of minorities and other residents of high-crime areas.").  Presence in a high-crime area, in other words, is as likely an explanation for innocent and non-dangerous gun possession as it is an indication that gun possession is illegal or dangerous, and it does nothing to help police tell the difference.

---

[8] We note that most of our cases assessing the relevance of a high-crime area involve nighttime police encounters, whereas the events at issue here transpired during the afternoon.  Given our holding, we need not consider the effect of a daylight setting on any inferences that otherwise might be drawn from a high-crime location.

As discussed above, in states allowing the public possession of weapons, authorizing a <u>Terry</u> pat-down in connection with a traffic stop whenever there is reasonable suspicion that a person is armed would give the police unchecked discretion in deciding which armed citizens to frisk. Allowing such automatic frisks only in high-crime areas would do nothing to address that concern; instead, it would guarantee that the costs of such intrusions would be borne disproportionately by the racial minorities and less affluent individuals who today are most likely to live and work in neighborhoods classified as high-crime. <u>See</u> <u>Black</u>, 707 F.3d at 542. Given the lack of probative value associated with a high-crime area when it comes to gun possession, there is no justification for adopting such a rule. "The new constitutional and statutory rights for individuals to bear arms at home and in public apply to all," and "[t]he courts have an obligation to protect those rights" in neighborhoods labeled "bad" as well as "good." <u>Williams</u>, 731 F.3d at 694.

Again, we recognize that expanded rights to openly carry or conceal guns in public may give rise to genuine safety concerns on the part of police officers, as well as other citizens, who more often will find themselves confronting individuals who may be armed. But where a sovereign state has made the judgment that its citizens may safely arm themselves in public, we cannot

25

presume that public gun possession gives rise to a reasonable suspicion of dangerousness, no matter what the neighborhood. And because the rest of the circumstances surrounding this otherwise unremarkable traffic stop do not add appreciably to the reasonable suspicion calculus, we must conclude that Terry did not authorize the police to conduct a frisk of Robinson. Accordingly, we reverse the decision of the district court denying Robinson's motion to suppress and vacate Robinson's conviction and sentence.

## III.

For the foregoing reasons the judgment of the district court is

REVERSED AND VACATED.

NIEMEYER, Circuit Judge, dissenting:

The majority acknowledges that when Captain Robbie Roberts confronted Shaquille Robinson following a lawful traffic stop, Roberts had reasonable suspicion to believe that Robinson was armed with a loaded gun concealed in his pocket. Nonetheless, it concludes that Captain Roberts could not have reasonably believed that he was in danger because, for all Roberts knew, Robinson could have been carrying a concealed weapon pursuant to a license issued by West Virginia. The majority reasons that Roberts was required to presume that Robinson was "a law-abiding citizen who pose[d] no danger to the authorities." Ante at 13. Therefore, it holds, the frisk, which Roberts conducted for his safety and the safety of a fellow officer, violated the Fourth Amendment.

This remarkable holding establishes a new approach that will make traffic stops substantially more dangerous to police officers and that is based, I respectfully submit, on several basic flaws of law and logic. First, the majority's approach modifies the Supreme Court's existing criteria for frisks by requiring indicia of dangerousness distinct from and in addition to the danger posed by an individual's possession of a firearm during the course of a forced police encounter. The majority fails to accept the Supreme Court's explanation that a reasonable officer need have only a suspicion that the

27

individual who has been lawfully stopped is armed and thus dangerous.  See Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977) (per curiam); Terry v. Ohio, 392 U.S. 1, 28 (1968).

Second, the fact that Robinson could have been licensed to carry a concealed weapon does not minimize the danger that prompted the Supreme Court in Terry to authorize protective frisks under the Fourth Amendment.  The Supreme Court has explained that the dangerousness justifying the frisk arises from the combination of the police forcing an encounter with a person and that person's possession of a gun, whether the possession of a gun was legal or not.  See Adams v. Williams, 407 U.S. 143, 146 (1972).  The frisk authorized by Terry is justified by dangerousness, not by criminal conduct.

Third, in hypothesizing innocence to various isolated aspects of Robinson's conduct -- for instance, that he could have possessed the gun legally and that its possession in a high crime area is consistent with "innocent and non-dangerous gun possession," ante at 24 -- the majority overlooks the Supreme Court's guidance that "reasonable suspicion need not rule out the possibility of innocent conduct." Navarette v. California, 134 S. Ct. 1683, 1691 (2014) (internal quotation marks and citation omitted).  It also overlooks the totality of the real world circumstances that leaves no doubt that Captain Roberts had a reasonable suspicion that Robinson was armed and

28

dangerous. Not only did Roberts have good reason to believe that Robinson possessed a loaded gun in his pocket, he also had information indicating that Robinson had both loaded and concealed the gun while in a well-known drug market. And Captain Roberts' suspicion was only heightened when, prior to the frisk, he asked Robinson whether he had a gun and Robinson responded with an "'oh, crap' look[]," taken by Roberts as indicating that Robinson did not want to deny possession of a gun and thus lie, but also did not want to confess to possessing one.

With the majority's new approach to what justifies a frisk during a lawful stop, police officers will be confused and their efforts in protecting themselves impaired. Traffic stops, which the Supreme Court has noted are already "especially fraught with danger," Michigan v. Long, 463 U.S. 1032, 1047 (1983), will become yet more dangerous as a result. The majority, I am afraid, has forgotten Terry's fundamental principle that the Fourth Amendment does not "require . . . police officers [to] take unnecessary risks in the performance of their duties." 392 U.S. at 23.

I respectfully dissent.

The facts are not disputed. At about 3:55 p.m. on March 24, 2014, an unidentified man called the Ranson, West Virginia Police Department and told Officer Crystal Tharp that he had just "witnessed a black male in a bluish greenish Toyota Camry load a firearm [and] conceal it in his pocket" while in the parking lot of the 7-Eleven on North Mildred Street. He advised Officer Tharp that the Camry was being driven by a white woman and had "just left" the parking lot, traveling south on North Mildred Street.

The 7-Eleven on North Mildred Street is adjacent to the Apple Tree Garden Apartments, and the area constitutes the highest crime area in Ranson, which itself is a high crime city. One officer who testified said that in his short one and a half years as a state trooper, he experienced at least 20 incidents of drug trafficking in the 7-Eleven parking lot. Another officer testified that "when [she] was doing drug work[,] . . . [she] dropped an informant off to buy drugs" at the 7-Eleven parking lot and observed "three other people waiting for drugs in that parking lot." She added that she had personally received "numerous complaints" of people running between the parking lot and the apartment complex, making drug transactions. Another officer testified that "[a]nytime you hear Apple Tree or 7-Eleven, your radar goes up a notch." Accordingly, when the

Ranson Police Department received the tip about someone loading a gun in the 7-Eleven parking lot, its officers' "radar [went] up a notch," and the officers went "on heightened alert."

While still on the telephone with the caller, Officer Tharp relayed the information to Officer Kendall Hudson and Captain Roberts. Hudson immediately left the station to respond to the call, and Roberts left soon thereafter to provide backup.

When Officer Hudson turned onto North Mildred Street a short time later, he observed a blue-green Toyota Camry being driven by a white female with a black male passenger. Noticing that they were not wearing seatbelts, Hudson effected a traffic stop at a location approximately seven blocks, or three-quarters of a mile, south of the 7-Eleven. He estimated that the traffic stop took place two to three minutes after the call had been received at the station.

After calling in the stop, Officer Hudson approached the driver's side of the vehicle and asked the driver for her license, registration, and proof of insurance. He also asked the male passenger, the defendant Robinson, for his identification before realizing that that was "probably not a good idea" because "[t]his guy might have a gun[,] [and] I'm asking him to get into his pocket to get his I.D." Instead, Officer Hudson asked Robinson to step out of the vehicle.

31

At this point, Captain Roberts arrived and opened the front passenger door. As Robinson was exiting the vehicle, Captain Roberts asked him if he had any weapons on him. Instead of responding verbally, Robinson "gave [Roberts] a weird look" or, more specifically, an "'oh, crap' look[]." Roberts took the look to mean, "I don't want to lie to you, but I'm not going to tell you anything [either]." At this point, Captain Roberts directed Robinson to put his hands on top of the car and performed a frisk for weapons, recovering a loaded gun from the front pocket of Robinson's pants. After conducting the frisk, Captain Roberts recognized Robinson and recalled that he had previously been convicted of a felony.

After Robinson was charged with the illegal possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), he filed a motion to suppress the evidence of the firearm and ammunition seized during the frisk, arguing that the frisk violated his Fourth Amendment rights.

The district court denied the motion, concluding that the officers possessed reasonable suspicion to believe that Robinson was armed and dangerous. Relying on Navarette, 134 S. Ct. at 1688-89, the court concluded that the anonymous caller's eyewitness knowledge and the contemporaneous nature of the report indicated that the tip was sufficiently reliable to contribute to the officers' reasonable suspicion. The court

32

explained that the "anonymous tip that [Robinson] [had] recently loaded a firearm and concealed it on his person in a public parking lot in a high-crime area," when combined with Robinson's "weird look and failure to verbally respond to the inquiry whether he was armed," gave rise to a reasonable suspicion that Robinson was armed and dangerous.

Robinson thereafter pleaded guilty to the gun possession charge, reserving his right to appeal the district court's denial of his suppression motion, and the district court sentenced him to 37 months' imprisonment. Robinson filed this appeal, challenging Captain Roberts' frisk under the Fourth Amendment.

II

Robinson's appeal is defined as much by what he concedes as by what he challenges. Robinson rightfully acknowledges that the Ranson police had the right to stop the vehicle in which he was a passenger after observing a traffic infraction, see Whren v. United States, 517 U.S. 806, 819 (1996), and also that they had the authority to direct him to exit the vehicle during the valid traffic stop, see Maryland v. Wilson, 519 U.S. 408, 415 (1997). He also correctly concedes that the anonymous tip received by the Ranson Police Department was sufficiently reliable to justify the officers' reliance on it. See

33

*Navarette*, 134 S. Ct. at 1688-89 (concluding that an anonymous 911 call "bore adequate indicia of reliability for the officer to credit the caller's account" in large part because, like here, the caller "claimed eyewitness knowledge of the alleged [conduct]" and the call was a "contemporaneous report" that was "made under the stress of excitement caused by a startling event"). Finally, and most importantly, he does not contest the district court's conclusion that the police had reasonable suspicion to believe that he was armed, surely recognizing that he perfectly matched the caller's specific description of the individual whom the caller claimed to have just seen with a gun.

Robinson's argument is that while the officers may well have had good reason to suspect that he was carrying a loaded concealed weapon, they lacked objective facts indicating that he was also dangerous, so as to justify a frisk for weapons, since an officer must reasonably suspect that the person being frisked is both armed and dangerous. Robinson notes, in this regard, that West Virginia residents may lawfully carry a concealed firearm if they have received a license from the State. See W. Va. Code § 61-7-4. Because the police did not know whether or not Robinson possessed such a license, he contends that the tip that a suspect matching his description was carrying a loaded firearm concealed in his pocket was a report of innocent

34

behavior that was not sufficient to indicate that he posed a danger to others.

The majority accepts this argument and, in doing so, adopts its several flaws, both as a matter of law and as a matter of logic. Thus, it establishes a new principle in tension with basic Supreme Court jurisprudence, holding that, "in states like West Virginia, which broadly allow public possession of firearms, reasonable suspicion that a person [lawfully stopped] is armed does not by itself give rise to reasonable suspicion that the person is dangerous for Terry purposes." Ante at 14-15. Under the majority's new standard, a frisk during a traffic stop must be justified by more than suspicion that the person who has been stopped is armed.

The majority achieves this position by dissecting the armed-and-dangerous requirement into two distinct requirements, holding that dangerousness must exist separately and to a greater extent than the danger created by the person's possession of a gun during a lawful but forced police encounter. Respectfully, this fundamentally twists the Supreme Court's armed-and-dangerous standard and, in any event, defies common sense.

In Terry, where the Court first authorized a stop and frisk under the Fourth Amendment without probable cause, the Court was confronted with two distinct issues: first, whether a person

35

could be stopped on suspicion of criminal conduct that fell short of probable cause; and second, whether the officer could conduct a protective frisk or "pat down" during the stop. As the Court posed the second issue, "We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." Terry, 392 U.S. at 23 (emphasis added). Accordingly, the frisk that the Court ultimately authorized had to be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer." Id. at 26. In approving the frisk before it, the Court observed that "Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered weapons." Id. at 30. The concern -- the danger -- was thus the presence of a weapon during a forced police encounter. The Court said this explicitly in approving Officer McFadden's frisk, noting that "a reasonably prudent man would have been warranted in believing petitioner was armed and thus presented a threat to the officer's safety." Id. at 28 (emphasis added). In this fashion, the Court approved the well-known standard that during a Terry stop, an officer can frisk a suspect if the

36

officer reasonably believes that the suspect is armed and thus dangerous, or, in short, "armed and dangerous."

The Court again relied on this exact understanding in Mimms, where an officer, after making a routine traffic stop, "noticed a large bulge" under the defendant's jacket and therefore conducted a frisk. 434 U.S. at 107. Holding that the frisk was clearly justified, the Mimms Court explained that "[t]he bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer," adding that "[i]n these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.'" Id. at 112 (emphasis added). The only evidence of Mimms' dangerousness on which the Court relied was the bulge indicating that Mimms was armed. It was thus Mimms' status of being armed during a forced police encounter (the traffic stop) that posed the danger justifying the frisk.

The armed-and-dangerous appellation is thus a unitary concept, and no further evidence of dangerousness is required to justify a frisk once a police officer reasonably suspects that an individual who has been lawfully stopped is armed. This approach rests on the well-recognized background level of risk attendant whenever police use their authority to effect a stop. This holds true whether the temporary detention is a traditional Terry stop to investigate an officer's reasonable suspicion

37

"that the person apprehended is committing or has committed a criminal offense," Arizona v. Johnson, 555 U.S. 323, 326 (2009), or a stop to enforce a jurisdiction's traffic laws, see id. at 331 ("[T]he risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop'" (quoting Wilson, 519 U.S. at 414)); see also Mimms, 434 U.S. at 110 (emphasizing that the Court had previously "expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations"). To be sure, this general risk does not, by itself, justify a frisk, but it is a component background risk such that when an officer suspects that the person he has stopped -- a person whose propensities are unknown -- is "armed with a weapon," Terry, 392 U.S. at 23, the officer is "warranted in the belief that his safety . . . [is] in danger," id. at 27. A Terry frisk is then lawful, with or without any additional signs indicating that the individual may be dangerous. See United States v. Rodriguez, 739 F.3d 481, 491 (10th Cir. 2013) (concluding that "an officer making a lawful investigatory stop [must have] the ability to protect himself from an armed suspect whose propensities are unknown" and therefore rejecting the defendant's argument that the officer

38

"had no reason to believe he was dangerous" even though the officer had seen a handgun tucked into the waistband of his pants).

The cases relied on by the majority miss the mark. They do not concern what justifies a frisk after a lawful stop is made. Their holdings instead relate to whether possession of a gun gives rise to a reasonable suspicion of criminal activity, therefore justifying a Terry stop in the first instance. See United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013) ("[W]here a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention" (emphasis added)); Northrup v. City of Toledo Police Dep't, 785 F.3d 1128, 1133 (6th Cir. 2015) ("[T]he Ohio legislature has decided its citizens may be entrusted with firearms on public streets. The Toledo Police Department has no authority to disregard this decision . . . by detaining every 'gunman' who lawfully possesses a firearm" (emphasis added) (citation omitted)); United States v. Williams, 731 F.3d 678, 692-93 (7th Cir. 2013) (Hamilton, J., concurring) ("A Terry stop does not require probable cause for an arrest, of course, but it still requires reasonable suspicion of genuinely criminal conduct. Based on the new Wisconsin law, that is hard to find on this record"); United States v. Ubiles, 224 F.3d 213, 214 (3d Cir. 2000) ("[T]he stop and subsequent search were unjustified

because the precondition for a 'Terry' stop was not present in this case"). These cases thus have little bearing on the present case, where both Robinson and the majority acknowledge that the police had the right to detain Robinson and the only issue is whether Captain Roberts acted reasonably to protect his safety and the safety of his fellow officer during that encounter. The majority has thus conflated the nature of suspicion for making a stop in the first instance with the nature of suspicion for conducting a frisk during a lawful stop. The first requires a suspicion of criminal conduct, while the latter requires suspicion of weapons possession. It is clear that if the officer has a reasonable suspicion that the person he has stopped is armed, the officer may conduct a frisk.

In sum, established law imposes two requirements for conducting a frisk: first, that the officer have conducted a lawful investigatory stop, which includes both traditional Terry stops as well as traffic stops; and second, that during the valid but forced encounter, the officer reasonably suspect that the person is armed and therefore dangerous. Both were satisfied in this case, thus justifying Captain Roberts' frisk under the Fourth Amendment as a matter of law.

Also, as a matter of logic, the majority's position -- that because Robinson could have been licensed under West Virginia law to carry a concealed weapon, Captain Roberts could not have

40

reasonably believed that he was dangerous -- is flawed. It does not follow that because an individual has a license to carry a concealed weapon, he does not pose a threat to officers' safety during a lawful but forced police encounter. Indeed, when a person is stopped on the highway for a traffic infraction, that person poses a heightened risk of danger simply by possessing a firearm during the encounter, whether the weapon is possessed legally or not. As the Supreme Court has explained, "The purpose of this limited search [i.e., the frisk] is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law." Adams, 407 U.S. at 146 (emphasis added). The majority's position directly conflicts with this, concluding that . . . when gun possession is legal, "there is no reason to think that a person carrying or concealing a weapon during a traffic stop is anything but a law-abiding citizen who poses no danger to the authorities." Ante at 12-13.

Contrary to the majority's thesis, nothing about the assumed recent liberalization of gun laws changes the proper analysis. The majority's analysis rests on the premise that, without some other basis for suspecting danger, an officer can reasonably suspect that an armed individual who has been

41

detained during a traffic stop only presents a threat to the officer's safety if the stop takes place in a jurisdiction where gun possession is generally illegal. See ante at 18 ("[O]nce state law routinely permits the public possession of weapons, the fact that an individual is armed, in and of itself, is not an objective indication of danger"). But the presumptive lawfulness of an individual's gun possession in a particular state does nothing to negate the reasonable concern an officer would almost invariably feel for his own safety when forcing an encounter with an unknown individual who is armed with a gun and whose propensities are unknown. See Rodriguez, 739 F.3d at 491.

The final flaw in the majority's approach is attributable to its focus on isolated, innocent possibilities of Robinson's conduct -- that he could be an innocent citizen carrying a gun as authorized by a lawfully issued license; that he was coincidentally in a high-drug zone; and that he had no legal duty to tell Captain Roberts of any license to carry a gun -- and its failure to consider the totality of the actual circumstances presented. To be sure, the observations that the majority makes about the possibilities of innocent conduct in isolated circumstances may be valid, but in the context of the real world circumstances, considered as a whole, they are neither likely nor relevant. As an initial matter, the majority's analysis completely overlooks the Supreme Court's

42

recognition that "reasonable suspicion <u>need not</u> rule out the possibility of innocent conduct." <u>Navarette</u>, 134 S. Ct. at 1691 (emphasis added) (internal quotation marks and citation omitted). Rather, the inquiry must, as the Supreme Court has repeatedly instructed, be based on common sense, <u>see</u> <u>Navarette</u>, 134 S. Ct. at 1690; <u>Illinois v. Wardlow</u>, 528 U.S. 119, 125 (2000); <u>Ornelas v. United States</u>, 517 U.S. 690, 695 (1996), and must be focused on what a reasonable officer would believe <u>in light of the totality of the circumstances</u>. The majority's innocent possibilities analysis, by contrast, fails to give due weight to two key facts known to Captain Roberts and the "commonsense judgments and inferences" that Roberts could draw from those facts when taken together. <u>Wardlow</u>, 528 U.S. at 125.

<u>First</u>, the reliable tip in this case was not just that an individual matching Robinson's description possessed a gun. Rather, the caller reported that he had observed an individual "load a firearm [and] conceal it in his pocket" while in the parking lot of the 7-Eleven on North Mildred Street, <u>a location that the officers knew to be a popular spot for drug-trafficking activity</u>. Indeed, at the evidentiary hearing, a state trooper who had been on the force only a year and a half estimated that he had experience with at least 20 incidents of drug trafficking in that particular parking lot. Another officer testified that "when [she] was doing drug work[,] . . . [she] dropped an

43

informant off to buy drugs there" and observed "three other people waiting for drugs in that parking lot." A third officer explained, "[a]nytime you hear . . . 7-Eleven, your radar goes up a notch." Knowing that the 7-Eleven parking lot was frequently used as a site for drug trafficking, a reasonable officer could legitimately suspect that an individual who was seen both loading and concealing a gun in that very parking lot may well have been doing so in connection with drug-trafficking activity. See United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002) (recognizing the "numerous ways in which a firearm might further or advance drug trafficking"). Thus, that an individual matching Robinson's description was reported to have recently loaded and concealed a firearm while in a parking lot so well known for its connection to drug activity greatly reinforces the reasonableness of Captain Roberts' suspicion that Robinson was both armed and dangerous.

Second, when Captain Roberts asked Robinson, as he was getting out of the car, whether he was carrying any firearms, Robinson gave the officer an "'oh, crap' look[]," which Roberts took to mean, "I don't want to lie to you, but I'm not going to tell you anything [either]." Surely, this was not the reaction of a person who legally possessed a concealed weapon for a benign purpose. In other words, Robinson's response to Captain Roberts' question not only confirmed Roberts' suspicion that

44

Robinson had a concealed weapon, it also made it eminently reasonable for Captain Roberts to suspect that Robinson's possession of a concealed weapon was illegal and dangerous. See W. Va. Code § 61-7-3 (making it a crime to carry a concealed deadly weapon without a license or other lawful authorization). That West Virginia does not impose a legal duty on those licensed to carry concealed weapons to report their gun possession when stopped by police does not obviate Captain Roberts' suspicion, based on common sense, that Robinson's silence was telling.

At bottom, the fact that Captain Roberts reasonably suspected that Robinson, who had been detained pursuant to a valid traffic stop, was armed and thus dangerous fully supports the legality of the frisk. But even beyond that, a proper consideration of the totality of the circumstances presented here -- the information provided by the reliable tip, the lawlessness prevalent at the relevant location, and Robinson's incriminating reaction during the traffic stop -- establishes, beyond doubt, that Captain Roberts' belief that Robinson was armed and dangerous was reasonable and that a protective frisk of Robinson's person during a valid stop was therefore warranted. "In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat down.'" Mimms, 434 U.S. at 112.

45

With an analysis that finesses the context that supported the officers' suspicions, the majority reaches a highly abstract result because "times have changed," ante at 12, and officers must allow that everyone can possess a gun during a traffic stop absent other indicators of dangerousness. But, in light of all the circumstances known to Captain Roberts, I submit that Roberts would unquestionably have been criticized for not having taken reasonable precautions if, after failing to conduct a frisk, something untoward had happened.

I would affirm the district court's denial of Robinson's motion to suppress, which was undoubtedly correct.