## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 28 2017, 9:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

John R. Watkins
Arata Law Firm
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Lantz D. Garrett,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

September 28, 2017

Court of Appeals Case No.
02A03-1702-CR-294

Appeal from the Allen Superior Court

The Honorable David M. Zent, Magistrate

Trial Court Cause No.
02D05-1608-CM-3038

**Brown, Judge.**

[1] Lantz D. Garrett appeals his conviction for carrying a handgun without a license as a class A misdemeanor. He raises two issues which we revise and restate as:

I. Whether the trial court abused its discretion in admitting evidence obtained following a pat-down; and

II. Whether the trial court abused its discretion in instructing the jury.

We affirm.

*Facts and Procedural History*

[2] At approximately 11:05 p.m. on August 5, 2016, Fort Wayne Police Officer Jason Anthony was driving in his police cruiser in the 5200 block of Decatur Road when he heard approximately sixteen gunshots. (Shortly after hearing the gunshots, officers were dispatched to the alley near Spatz Avenue and Senate Avenue regarding multiple residents calling to report that they heard gunshots being fired in the area. Dispatch also stated that a caller indicated that the gunshots were fired by a group of people that had just arrived in a silver gray colored Impala.

[3] Fort Wayne Police Officer Jason Fuhrman responded to the dispatch of shots fired and was the first officer at the scene less than one minute later. He observed approximately ten to twelve people in the general area of the Impala, exited his vehicle, took his handgun out, pointed it towards the ground, and ordered the people to show him their hands. The people at the scene complied. Officer Fuhrman observed a pair of brass knuckles on the ground behind the

front driver's side tire. Officer Anthony arrived, observed approximately ten people standing near the silver or gray Impala, and told Officer Fuhrman that he had heard the shots. Garrett followed Officer Fuhrman's orders to put his hands up, walk to the sidewalk, and sit down. Officer Fuhrman and other officers who had arrived on the scene began to pat down the individuals. Officer Fuhrman patted down Garrett, who was the fourth or fifth person to be patted down, and removed a handgun from his pocket. Fort Wayne Police Detective Marc Deshaies arrived at the scene after officers had located the firearm and spoke to Gilberto Garza, Sr.[1]

[4] In August 2016, the State charged Garrett with carrying a handgun without a license as a class A misdemeanor. On November 14, 2016, Garrett filed a motion to suppress and argued that the search and seizure violated his rights under the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. After a hearing, the trial court denied Garrett's motion to suppress.

[5] On January 11, 2017, the court held a jury trial. Garrett objected to the admission of the gun, and the court overruled the objection. Officer Fuhrman testified in part that Garza was in the whole group of people when he arrived and that he did not pay attention to where Garza was located.

---

[1] Detective Deshaies testified that "[t]here were actually two Gilberto Garza's [sic]" and that "Gilberto Garza, Sr. was not in the back yard when I arrived. He later arrived from around the front of the house when I spoke with him." Trial Transcript at 108-109.

[6] On direct examination, Detective Deshaies testified that the Impala was parked in the alley behind a home and that the home's address was 4401 Southpark. When the prosecutor asked Detective Deshaies if he spoke to the homeowner on August 5, 2016, Garrett's counsel objected and the court sustained the objection. When asked if he learned through his investigation who lived at the residence, Garrett's counsel objected, and the court stated: "I guess depending on how he learned that you might be able to object and move to strike." Transcript at 101. The prosecutor then asked Detective Deshaies if he learned that evening where Garrett lived, and Detective Deshaies testified that Garrett did not live at "that residence." *Id.* at 101. Garrett's counsel objected, and the court overruled the objection. When the prosecutor asked if he learned who lived at 4401 Southpark Avenue, Detective Deshaies answered: "Yes. A male identified that he lived there at the residence." *Id.* at 104. Garrett's counsel objected on hearsay, and the court sustained the objection. Garrett's counsel moved to strike, and the court granted the motion. Detective Deshaies also testified that he found twenty-five shell casings from three different calibers and that the shells were found in the fenced-in yard and just outside the entrance to that yard. He also testified that Garza was ticketed for firing a gun in the city limits. After the State rested, Garrett's counsel called Detective Deshaies and asked him if he told Garza he could be charged with contributing to the delinquency of a minor if minors were allowed to drink on his property, and Detective Deshaies answered: "Yes sir, we had that conversation." *Id.* at 117. Detective Deshaies also testified that he had a long conversation with Garza about the criminal consequences of people shooting guns off in his yard.

[7] Garrett proposed an instruction which stated in part:

> It is a defense that the Defendant carried a handgun on or about his body while lawfully present in or on property that is owned, leased, rented, or otherwise legally controlled by another person, if the Defendant had consent of the owner, renter, lessor, or person who legally controls the property to have the handgun on the premises at the time of the charged offense. The burden is on the Defendant to prove this defense by a preponderance of the evidence.

Appellant's Appendix Volume II at 68. Garrett's counsel argued:

> In this case, we had the home owner, Gilberto Garza, we have that evidence that was just given in Detective Deshaies['s] testimony, was present in his yard or in or around the property. Within one minute of shots being fired, we have bullet casings all over the ground. They're all standing amongst casings all over the ground. They're all standing amongst bullet casings with the property owner. I think there is at least a scintilla of evidence and I think the jury should be allowed to decide whether there's a preponderance of the evidence to support the fact that Mr. Garrett and all the other kids on that property had permission of the property owner, Mr. Garza, who was present, to have firearms on that property.

Trial Transcript at 128. The State argued that the evidence demonstrated only that Garrett did not live at the residence, and the court denied Garrett's proposed instruction.

[8] The jury found Garrett guilty as charged. The court sentenced him to 365 days with 185 days suspended.

## *Discussion*

[9] The issue is whether the trial court abused its discretion in admitting evidence of the search. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. "[T]he ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014).

[10] In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Id.* If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 n.1 (Ind. 2014).

A. *Fourth Amendment*

[11] Garrett argues that Officer Fuhrman had no individualized suspicion that he arrived in the Impala, was the shooter, or was armed and dangerous. The State argues the search was reasonable as a brief pat-down designed to ensure officer

and public safety. The State points to the report of shots being fired, the proximity of the car to Garrett, and that an officer heard approximately sixteen shots. In reply, Garret asserts that the State has not alleged, nor could it given the officers' testimony, that the officers had reasonable suspicion that he was the individual that was armed and dangerous. He asserts that the State has omitted the "armed and dangerous" analysis set forth in *Terry*.

[12] The Fourth Amendment to the United States Constitution provides, in pertinent part: "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. If the search is conducted without a warrant, the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016).

[13] In *Terry v. Ohio*, the United States Supreme Court established the standard for determining the constitutionality of investigatory stops. 392 U.S. 1, 88 S. Ct. 1868 (1968). The Court ruled that police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has a reasonable suspicion of criminal activity. *Id.* at 27, 88 S. Ct. at 1883; *see also Jackson v. State*, 669 N.E.2d 744, 747 (Ind. Ct. App. 1996) ("In *Terry*, the Supreme Court held that 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot' the officer may briefly stop the suspicious person and make 'reasonable inquiries' to confirm or

dispel those suspicions.") (quoting *Terry*, 392 U.S. at 30, 88 S. Ct. at 1884). Reasonable suspicion exists if the facts known to the officer at the moment of the stop, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. *Powell v. State*, 841 N.E.2d 1165, 1167 (Ind. Ct. App. 2006). In judging the reasonableness of investigatory stops, courts must strike "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law [enforcement] officers." *Carter v. State*, 692 N.E.2d 464, 466 (Ind. Ct. App. 1997) (quoting *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 2640 (1979)). When balancing these competing interests in different factual contexts, a central concern is "that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* (citing *Brown*, 443 U.S. at 51, 99 S. Ct. at 2640). Therefore, in order to pass constitutional muster, reasonable suspicion must be comprised of more than an officer's general "hunches" or unparticularized suspicions. *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883. Whether an investigatory stop is justified is determined on a case by case basis. *Williams v. State*, 745 N.E.2d 241, 245 (Ind. Ct. App. 2001). In making this determination, we consider the totality of the circumstances. *Id.* "Judicial interpretation of what constitutes 'reasonable suspicion' is fact-sensitive." *Bridgewater v. State*, 793 N.E.2d 1097, 1100 (Ind. Ct. App. 2003), *trans. denied*.

[14]    In *Terry*, the United States Supreme Court held:

The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?

392 U.S. at 21-22, 88 S. Ct. at 1880 (footnote omitted).

[15] To the extent Garrett challenges the initial stop, we observe that Officer Fuhrman was responding to a scene at which shots had been fired, he arrived at the scene less than one minute after dispatch, and the Impala and a "group of people" mentioned by dispatch were present at the scene. Trial Transcript at 32. Under these circumstances, we conclude that Officer Fuhrman had reasonable suspicion to conduct an investigatory stop.

[16] As for the pat-down, the *Terry* Court permitted

a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

392 U.S. 1 at 27, 88 S. Ct. at 1883. The Court concluded that

where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S. Ct. at 1884-1885.

[17] "Police may not frisk for weapons 'on less than reasonable belief or suspicion directed at the person to be frisked.'" *Wilson v. State*, 745 N.E.2d 789, 792 (Ind. 2001) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 94, 100 S. Ct. 338, 343 (1979)). "An officer's authority to conduct a pat-down search is dependent upon the nature and extent of his particularized concern for his safety and that of others." *Id.* (citing *Mitchell v. State*, 745 N.E.2d 775, 781 (Ind. 2001)).

[18] While Garrett complied generally and the officers did not observe threatening behaviors from him or any bulges in his clothing, the officers were responding to a call of shots fired. The record reveals that Officer Anthony heard approximately sixteen gunshots and told Officer Fuhrman that he heard the shots. Shortly after hearing the gunshots, officers were dispatched to the alley due to multiple residents calling to report they had heard gunshots fired in the area. Upon arriving at the scene less than one minute later, Officer Fuhrman discovered a group of ten or twelve individuals, the Impala that was described

in the dispatch, and a pair of brass knuckles on the ground behind the front driver's side tire. When asked why he patted down the people at the scene, Officer Fuhrman testified, "Basically because I wanted to talk to them about what was going on, see if they . . . originally for officer safety, make sure there weren't any weapons there so we could all feel more comfortable when we were talking to each other and something that we don't have to worry about after we check them." Trial Transcript at 55. He added: "And with the fact that there were shots, the shots fired that Officer Anthony heard and the other people called about that there's, again, I wanted to make sure there wasn't a weapon on any of the people that were there." *Id.* at 55-56. Officer Anthony testified that the pat-down was conducted for officer safety. Detective Deshaies testified that the "safety measure goes for the officer that's arriving at the scene, but as well as everyone that could be an innocent person on the scene to ensure a limited frisk of the exterior of the clothing, to ensure that there's not a weapon present that could be utilized." *Id.* at 95.

[19]  In light of the nature of the call of shots fired, the number of shots fired, the multiple people that called 911, the presence of the group of people and the Impala as described in the dispatch, and Officer Fuhrman's arrival on the scene less than one minute later, we conclude that the State demonstrated that a reasonably prudent man in the circumstances would be warranted in the belief

that his safety or that of others was in danger. Accordingly, we cannot say that Garrett's rights under the Fourth Amendment were violated.[2]

B. *Article 1, Section 11*

Garrett argues that the officers had no individualized suspicion that he committed any crime or violation, the pat-down resulted in a high degree of intrusion, and, while there was a need for officers to use caution during the investigation, the officers should have made inquiries while the group stood with their hands on their heads instead of proceeding directly to a search of the entire group. The State asserts that the degree of suspicion that a violation had occurred was great, the degree of intrusion was minimal, and the extent of law enforcement needs was high.

Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly

---

[2] Garrett cites *United States v. Williams*, 731 F.3d 678, 690 (7th Cir. 2013), in which the court concluded that an officer lacked reasonable suspicion to conduct a frisk of the defendant at the time the frisk began, in violation of the defendant's Fourth Amendment rights. In that case, an anonymous 911 caller, who refused to provide her name, reported a group of twenty-five individuals acting loudly and displaying handguns in a parking lot. 731 F.3d at 680-681. The officers arrived at the scene three to five minutes after the call and observed a "much different scene than that reported by the anonymous caller." *Id.* at 681. "Instead of seeing a group of twenty-five belligerent men, the officers discovered only eight to ten individuals standing around a group of cars in the parking lot." *Id.* Unlike *Williams*, the present case involved a call of multiple shots fired, multiple people called 911, Officer Fuhrman arrived at the scene in less than one minute, and a group of people and the Impala as mentioned in the dispatch were present at the scene. Accordingly, we find *Williams* distinguishable.

describing the place to be searched, and the person or thing to be seized.

[22] Although its text mirrors the federal Fourth Amendment, we interpret Article 1, § 11 of our Indiana Constitution separately and independently. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). "When a defendant raises a Section 11 claim, the State must show the police conduct 'was reasonable under the totality of the circumstances.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1205-1206 (Ind. 2008), *reh'g denied*). "The focus of the exclusionary rule under the Indiana Constitution is the reasonableness of police conduct." *Hardister v. State*, 849 N.E.2d 563, 573 (Ind. 2006). "We consider three factors when evaluating reasonableness: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Robinson*, 5 N.E.3d at 368 (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

[23] With respect to the degree of concern, suspicion, or knowledge that a violation has occurred, multiple people called 911 and reported shots fired, Officer Anthony heard approximately sixteen shots, and Officer Fuhrman arrived on the scene less than a minute after dispatch and saw the Impala described in the dispatch. As for the degree of intrusion, Officer Fuhrman conducted a pat-down of Garrett's outer clothing. Under the circumstances, the degree of intrusion was not high. Finally, the extent of law enforcement needs for their own protection and the protection of the public was strong given the

circumstances leading to the pat-down. Under the totality of the circumstances, we conclude that the pat-down was reasonable and did not violate Garrett's rights under Article 1, Section 11 of the Indiana Constitution.

## II.

[24] The next issue is whether the trial court abused its discretion in instructing the jury. Generally, "[t]he purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003), *cert. denied*, 540 U.S. 1150, 124 S. Ct. 1145 (2004). Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion. *Id.* at 1163-1164. To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. *Benefiel v. State*, 716 N.E.2d 906, 914 (Ind. 1999), *reh'g denied*, *cert. denied*, 531 U.S. 830, 121 S. Ct. 83 (2000). When reviewing the refusal to give a proposed instruction, this court considers: (1) whether the proposed instruction correctly states the law; (2) whether the evidence supports giving the instruction; and (3) whether other instructions already given cover the substance of the proposed instruction. *Driver v. State*, 760 N.E.2d 611, 612 (Ind. 2002). "Even if there is only a 'scintilla' of evidence in support of a criminal defendant's proposed defense instruction, it should be left to the province of the jury to determine whether that evidence is believable or

unbelievable." *Hernandez v. State*, 45 N.E.3d 373, 378 (Ind. 2015) (quoting *Howard v. State*, 755 N.E.2d 242, 247-248 (Ind. Ct. App. 2001)).

[25] Before a defendant is entitled to a reversal, he must affirmatively show that the erroneous instruction prejudiced his substantial rights. *Lee v. State*, 964 N.E.2d 859, 862 (Ind. Ct. App. 2012) (citing *Gantt v. State*, 825 N.E.2d 874, 877 (Ind. Ct. App. 2005)), *trans. denied*. An error is to be disregarded as harmless unless it affects the substantial rights of a party. *Id.* (citing *Oatts v. State*, 899 N.E.2d 714, 727 (Ind. Ct. App. 2009); Ind. Trial Rule 61).

[26] Garrett argues that the jury could have concluded that the homeowner, Garza, gave consent to the occupants of his yard to possess handguns and the trial court erred by invading the province of the jury and refusing to instruct the jury on the affirmative defense. The State argues that the record did not support giving Garrett's instruction and that there was not even a scintilla of evidence that he possessed his gun exclusively while on the property owned by Garza, or that Garza, as homeowner, consented.

[27] At the time of the offense, Ind. Code § 35-47-2-1(b) provided in part:

> Except as provided in subsection (c), a person may carry a handgun without being licensed under this chapter to carry a handgun if:
>
> * * * * *
>
> (2) the person carries the handgun on or about the person's body while lawfully present in or on property that is

> owned, leased, rented, or otherwise legally controlled by another person, if the person:
>
> > (A) has the consent of the owner, renter, lessor, or person who legally controls the property to have the handgun on the premises;[3]

[28] On appeal, Garrett asserts that Garza owned the property where the bullet casings were found and cites page 96 of the transcript. Our review of page 96 of the transcript does not reveal that Garza owned the particular property.[4] The record does not contain evidence that Garza gave Garrett consent to have the handgun on his premises. Further, Detective Deshaies testified that shells were found in the fenced-in yard and outside the entrance to that yard. We cannot say that the evidence supports giving Garrett's proposed instruction or that the trial court abused its discretion in refusing the instruction.

### *Conclusion*

[29] For the foregoing reasons, we affirm Garrett's conviction.

[30] Affirmed.

Najam, J., and Kirsch, J., concur.

---

[3] Subsequently amended by Pub. L. No. 221-2017, § 1 (eff. July 1, 2017).

[4] As noted, when the prosecutor asked Detective Deshaies if he learned who lived at 4401 Southpark Avenue, Detective Deshaies answered: "Yes. A male identified that he lived there at the residence." *Id.* at 104. Garrett's counsel objected on hearsay, and the court sustained the objection.